26 A.3d 1059

IN THE MATTER OF ANTHONY STALLWORTH, CAMDEN
COUNTY MUNICIPAL UTILITIES AUTHORITY.

Argued February 8, 2011—Decided April 12, 2011.

*Peter B. Paris* argued the cause for appellant Anthony Stall-worth (*Mets, Schiro & McGovern,* attorneys; *Kevin P. McGovern,* of counsel).

*Robert H. Benacchio* argued the cause for respondent Camden County Municipal Utilities Authority (*Peckar & Abramson,* attorneys).

*Andrea R. Grundfest,* Deputy Attorney General, submitted a statement in lieu of brief on behalf of respondent Civil Service Commission (*Paula T. Dow,* Attorney General of New Jersey, attorney).

Judge STERN (temporarily assigned) delivered the opinion of the Court.

In this appeal involving the discipline of a public employee, we consider whether the Appellate Division exceeded its proper scope of review when it reversed the penalty imposed by the Civil Service Commission (Commission)[1] and reinstated the penalty imposed in the initial decision of an Administrative Law Judge (ALJ). In addressing this issue, we must reexamine the principles of "progressive discipline," taking into account the Commission's expertise in promoting statewide uniformity in the discipline of civil servants as well as a public agency's need to deter employee misconduct and preserve its public image. The Commission reversed a determination of a public body to terminate petitioner's employment, and, although we agree with the Appellate Division that the Commission's action was not sufficiently justified by the record, we also conclude the Appellate Division exceeded its authority by reinstating the termination as ordered by the appointing authority. We, therefore, modify the judgment of the Appellate Division and remand the matter for further proceedings before the Commission.

I.

Petitioner Anthony Stallworth was a pump station operator for the Camden County Municipal Utilities Authority (CCMUA). The CCMUA is a regional authority that handles wastewater collection and treatment in Camden County. It controls twenty-five pumping stations, sixteen metering stations, and 110 miles of pipes that connect the stations to a central treatment plant in Camden

---

[1] Pursuant to *N.J.S.A.* 11A:2–1, as amended by *L.* 2008, *c.* 29 (eff. Jun. 30, 2008), the Department of Personnel and the Merit System Board have been replaced by the Civil Service Commission. Therefore, although the matter was heard and determined by the predecessor Merit System Board, for the sake of using current terms and for ease of understanding our ultimate disposition, all references to the former Merit System Board shall be to the Commission.

County. The CCMUA employs pump operators to assist with oversight and maintenance.

At the time of the incident giving rise to this case, Stallworth had been employed by the CCMUA for seventeen years. As part of his job responsibilities, he was provided with a marked CCMUA truck in which he traveled to and from pumping stations and pipelines. The truck had a navigation system that could be monitored by the CCMUA. On the morning of November 15, 2005, Stallworth left the pumping station to which he was assigned and went to a convenience store two blocks away. He remained there for approximately one hour and fifteen minutes—one hour longer than the fifteen-minute morning break he was authorized to take.[2]

Stallworth was subsequently served with disciplinary charges, including "(1) falsification of official records or giving false information for official records; (2) leaving the work area without permission during work hours; and (3) personal use of a company vehicle." Based on these charges and his disciplinary history, the CCMUA terminated Stallworth's employment, resulting in his appeal to the Commission,[3] and a referral to the Office of Administrative Law, where a "contested case" hearing was conducted. *See N.J.S.A.* 52:14B-9, -10. The evidence adduced before the ALJ demonstrated the following:

Pump operators are subject to a Collective Bargaining Agreement (CBA). The CBA allots pump operators a morning break of fifteen minutes, a lunch break of thirty minutes, and an afternoon break of fifteen minutes. However, pump operators must often work through a break or lunch, and other pump operators testified that it is common CCMUA practice to add the missed break or lunch time on to the next break.

---

[2] The times are taken as recorded by the truck's navigation system. There is no dispute as to the essential facts relating to the events of November 15, 2005.

[3] These charges and others were "sustained" by the CCMUA and Stallworth was "removed" on February 7, 2007 after a hearing.

Stallworth also testified that it is common practice at the CCMUA for pump operators to combine break times to take a longer break. Stallworth indicated that he often took his morning and lunch breaks together and did so to ensure that he had enough time to eat in the morning for the proper management of his diabetes. Stallworth stated he generally did not take a lunch, as he used his lunch time in the morning. He further claimed that it was common knowledge that he took such breaks and that his "main supervisor" knew that he was diabetic.

On November 15, 2006, Stallworth was issued a truck in order to complete his assignments for the day. At 7:53:27 a.m., he arrived at his first assigned station, the Bellmawr pumping station. Approximately ten minutes later, he left the Bellmawr station and drove to the One Stop Shop, a convenience store, two blocks from the Bellmawr station. At the One Stop Shop, Stallworth ate breakfast, played the lottery, and socialized with patrons and staff. He also admitted leaving the truck unlocked but stated that it was always within his sight.

According to Stallworth, he did not keep track of time while in the store. When he returned to his truck, he realized that the keys were missing. After searching his pockets and the truck, he returned to the store to find that the keys had fallen near the cash register. He did not want to reach for the keys, as he did not want to be perceived as committing a theft; so he waited for the store owner to get them for him. Once he secured the keys, Stallworth drove back to the Bellmawr station. He restarted the truck at 9:19:37 a.m., one hour and sixteen minutes after he initially left. Although he knew he had exceeded his allotted break time, Stallworth did not call his supervisor or notify anyone of his prolonged absence.

Stallworth's supervisor testified at the hearing that when asked about his prolonged absence, Stallworth merely said, "[y]eah, whatever." When Stallworth was asked at the hearing why he did not tell his supervisor that he was diabetic and leaving to get something to eat, he responded, "why should I have to tell him."

Testimony was also presented about Stallworth's prior disciplinary history, which included multiple violations of the CCMUA's "Critical Rules." Robert Cornforth, the Director of Operations and Maintenance for the CCMUA, testified that any violation of a Critical Rule was deemed "a major infraction by the agency." He also testified that the CCMUA sought to terminate Stallworth for the present offense after reviewing and taking into account his "extensive" disciplinary history.

With respect to the present charges, the ALJ found Stallworth's explanation that he combined his morning and lunch breaks to be incredible.[4] The ALJ found that Stallworth had violated CCMUA Critical Rule 36.2(L) "by leaving the work area without permission during work hours" and Critical Rule 36.2(Q) "because he was in possession of the County vehicle for more than the allotted [fifteen] minute break time." The charge of violating Critical Rule 36.2(I) related to Stallworth not having adjusted his time record for this absence. The ALJ found this charge was not sustained because "the matter was immediately brought to the attention of his supervisors," and Stallworth was not instructed by a supervisor to make such an adjustment.

The ALJ noted Stallworth's extensive "disciplinary record," listing sixteen charges (including fourteen "Critical Rule" violations) sustained against him between 1993 and 2006. The record included six separate charges of violating Critical Rule 36.2(O), "performing work of inferior quality"; two prior charges of violating Critical Rule 36(Q), "personal use of company vehicle;"

---

[4] In his findings of fact, the ALJ stated:

Appellant's explanation of combining his morning and lunch break is not credible. He had at least four critical opportunities to explain this situation: (1) When this initially happened; (2) When presented with the warning; (3) During the departmental hearing; and (4) During an unemployment hearing. No such defense was offered. Even if he had combined his fifteen-minute break and thirty-minute lunch break, he was still thirty minutes late. There is no valid reason for the appellant to remain at a convenience store two blocks from the job site for one hour and fifteen minutes without contacting the CCMUA if he had a problem.

charges of violating Critical Rules 36.2(K) and (R), insubordination; and charges of violating Critical Rules 36(R), "harassment;" 36.2(H), "endangering the life of others;" 36.2(R), "conduct that will reflect discredit upon the [A]uthority;" and 36.2(P), "sleeping" on the job. While recognizing the concept of "progressive discipline," the ALJ found the incident at hand "egregious enough to warrant removal." [5] He further found that

> [t]he act of taking an hour and fifteen minute break during a fifteen minute break period without notice to anyone, and having the CCMUA truck parked in front of a convenience store for that time visible to the public is conduct totally contrary to the interests of the CCMUA and adversely affected the public's perception of the trust and confidence of that agency.

The Commission, while "accept[ing] and adopt[ing]" the findings of fact that Stallworth had committed the acts charged, concluded that that the penalty imposed was too harsh. It determined to modify the penalty from removal to a four-month suspension. *See N.J.S.A.* 52:14B–10; *N.J.S.A.* 11A:2–6. It also directed that Stallworth be immediately reinstated, with the appropriate back pay. *See N.J.A.C.* 4A:2–2.10.

In assessing the appropriate penalty, the Commission took into account Stallworth's employment history and record, noting that he was a "seventeen year employee," and his disciplinary record evidenced only one major disciplinary action—a fifteen-day suspension—and several minor disciplinary actions. The Commission recognized "that where the underlying conduct is of an egregious nature, the imposition of a penalty up to and including removal is appropriate, regardless of an individual's disciplinary history." However, although the Commission agreed with the ALJ that the present charges against Stallworth reflected poorly on the CCMUA, it rejected the ALJ's determination that, standing alone, it was egregious enough to warrant termination:

---

[5] In the record, the CCMUA claimed Stallworth had "[thirteen] previous rule violations, each of which would have alone justified termination." However, in the briefs before the Appellate Division and us, the CCMUA states that "[b]etween 1993 and 2006 Stallworth received fourteen separate disciplinary charges for violations of CCMUA Critical Rules."

While the [Commission] agrees with the ALJ's determination that the appellant's actions adversely affected the public's perception of the appointing authority, the [Commission] does not agree that the appellant's conduct was of such an egregious nature so as to impose a penalty of removal regardless of any mitigating factors. Accordingly, the [Commission] finds that a four-month suspension is the proper penalty in this matter. Moreover, the [Commission] recognizes that appellant's conduct is unacceptable and emphasizes that, in imposing a major disciplinary action, it is not acting to minimize the seriousness of the offense. The [Commission] is mindful that this penalty should serve as a warning to the appellant that future offenses may result in his removal from employment.

On the CCMUA's appeal, the Appellate Division, in an unpublished opinion, recognized the level of deference owed to a final decision of an administrative body such as the Commission. It also acknowledged that the Commission has particular expertise in the area of employee discipline and referenced *In re Carter,* 191 *N.J.* 474, 486, 924 *A.*2d 525 (2007), which reiterated that "courts should take care not to substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision." *Ibid.* (citing *In re License to Zahl,* 186 *N.J.* 341, 353–54, 895 *A.*2d 437 (2006)).

The Appellate Division did not expressly address the issue of whether Stallworth's present conduct warranted termination without regard to his prior history. In analyzing the Commission's determination, however, the Appellate Division was "unable to reconcile Stallworth's disciplinary history ... with the Commission's characterization of it as evidencing only one major disciplinary action, and several minor ones[,]" and found "particularly disturbing that there appears to be a pattern of repeatedly committing the same offense." Relying on the CCMUA Director's testimony that violations of "Critical Rules" are "major" infractions, the panel further concluded the offenses were "not minor in nature."

In reinstating the termination, the Appellate Division stated:

While employees of the Authority may not be as involved with issues of public safety as police or corrections officers, their job functions do touch directly upon public health and welfare. A breakdown anywhere along the miles of pipe line or in the pumping system could pose a significant risk to the public. Disappearing

from the job site, with no notification to anyone, shows a complete disregard for any potential consequences.

Public employment, moreover, is not a sinecure. A public employee has the responsibility to attend to his or her job responsibilities in a business-like and serious manner. And a public employer such as the [CCMUA] is entitled to expect all of its employees to perform their functions diligently and competently. [Stallworth]'s disciplinary history shows a blatant disregard of his most basic obligations as a public employee. It is difficult to conceive how the [CCMUA] could be expected to maintain a competent and dedicated workforce if it is not permitted to remove an employee with the work history of respondent.

There is much to be said for the Appellate Division's determination. Any public employer well knows the unique problems it faces, the public perception of its work product, and the need to deter other workers from committing similar violations, and no employer—whether public or private—should be compelled to retain an employee who is chronically insubordinate, disruptive, underperforming, or some combination thereof.

On the other hand, there must be fairness and generally proportionate discipline imposed for similar offenses by public employers and responsibility in one agency to assure such fairness and proportionality. *See N.J.S.A.* 11A:2–6 (authorizing Commission to "render the final administrative decision on appeals concerning permanent career service employees . . ." where they are removed or suspended for more than five days). Here the Appellate Division, using common sense and compelling rhetoric, plainly and simply disagreed with the Commission on the significance of Stallworth's disciplinary record, something uniquely within the expertise of the Commission.

It is the need to address those competing policies that led to the grant of certification in this appeal. *In re Stallworth,* 203 *N.J.* 438, 3 *A.*3d 1227 (2010).

## II.

Stallworth asserts that the Appellate Division erred when it reversed the Commission's progressive discipline analysis and reinstated his termination. He argues that the Appellate Division acknowledged that the precipitating offense, standing alone, did

not suffice to warrant termination without consideration of his prior record; that the penalty imposed by the Commission was not "shocking;" and that, in the circumstances presented, termination of employment violates the doctrine of progressive discipline. He further argues that the Appellate Division did not accord the appropriate deference to the Commission. Stallworth also claims that the Appellate Division's reversal of the Commission's decision due to a disagreement with the result "threatens the legitimacy of the [Commission] and its prominent role in effectively implementing a comprehensive personnel management system." Finally, he argues that, pursuant to *N.J.A.C.* 4A:2.2—which defines "major" discipline as punishment with a suspension of more than five days—the Commission correctly determined he had only one "major" disciplinary sanction in his time with the CCMUA and that the Appellate Division "misunderstood the significance of 'minor' versus 'major' disciplinary sanctions" for purposes of the concept of progressive discipline.

The CCMUA asserts that the Appellate Division's decision was correctly decided. It agrees that the Commission was properly reversed due to its erroneous calculation of "major offenses" in Stallworth's record. The CCMUA notes that the panel's decision was correctly based on the extent and nature of Stallworth's prior record as a whole and paid appropriate deference to the principles of progressive discipline.

The Commission argues that its decision should have been affirmed, as that decision was based on the evidence, and therefore not arbitrary, capricious, or unreasonable. Additionally, the Commission notes that there is "[a] strong presumption of reasonableness" that attached to its decision, and this presumption should be paid adequate deference. Quoting *In Re Herrmann*, 192 *N.J.* 19, 28–29, 926 *A.*2d 350 (2007), the Commission maintains that because the sanction was not "so disproportionate to the offense ... as to be shocking to one's sense of fairness," it should be affirmed.

194

## III.

### A.

■■■■ There are well-recognized principles governing the judicial review of administrative agency determinations. Appellate courts have "a limited role" in the review of such decisions. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579, 410 *A.*2d 686 (1980); *see also In re Carter, supra,* 191 *N.J.* at 482, 924 *A.*2d 525. In order to reverse an agency's judgment, an appellate court must find the agency's decision to be "arbitrary, capricious, or unreasonable, or [ ] not supported by substantial credible evidence in the record as a whole." *Henry, supra,* 81 *N.J.* at 579–80, 410 *A.*2d 686 (citing *Campbell v. Dep't. of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963)). "If a reviewing court concludes that a decision of the [Civil Service] Commission is arbitrary, the court may either finally determine the matter by fixing the appropriate penalty or remand it to the Commission for redetermination." *Henry, supra,* 81 *N.J.* at 580, 410 *A.*2d 686 (citing *West New York v. Bock,* 38 *N.J.* 500, 520, 527–28, 186 *A.*2d 97 (1962)).

■■■■ In determining whether agency action is arbitrary, capricious, or unreasonable, a reviewing court must examine:

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*Carter, supra,* 191 *N.J.* at 482–83, 924 *A.*2d 525, (quoting *Mazza v. Bd. of Trs.,* 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995)).]

A reviewing court "may not substitute its own judgment for the agency's, even though the court might have reached a different result." . *Carter, supra,* 191 *N.J.* at 483, 924 *A.*2d 525 (citing *Greenwood v. State Police Training Ctr.,* 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992)); *see also In re Herrmann, supra,* 192 *N.J.* at 28, 926 *A.*2d 350; *In re Polk,* 90 *N.J.* 550, 578, 449 *A.*2d 7 (1982)(reviewing court "has no power to act independently as an administrative tribunal or to substitute its judgment for that of the

agency"). This is particularly true when the issue under review is directed to the agency's special "expertise and superior knowledge of a particular field." *Herrmann, supra,* 192 *N.J.* at 28, 926 *A.*2d 350. The application of those principles is not limited to whether a violation warranting discipline has been proven; this "deferential standard applies to the review of disciplinary sanctions as well." *Ibid.* (citing *Knoble v. Waterfront Comm'n of N.Y. Harbor,* 67 *N.J.* 427, 431–32, 341 *A.*2d 593 (1975)). Accordingly, when reviewing administrative sanctions, appellate courts should consider whether the "punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness." *Carter, supra,* 191 *N.J.* at 484, 924 *A.*2d 525 (quoting *Polk, supra,* 90 *N.J.* at 578, 449 *A.*2d 7); *see also Herrmann, supra,* 192 *N.J.* at 28–29, 926 *A.*2d 350.

With those principles in mind, we consider whether the Appellate Division erred when it reversed the Commission's penalty because it determined that the Commission, in its progressive discipline analysis and fixing of the penalty, underestimated the significance of petitioner's prior disciplinary record.

## B.

The concept of progressive discipline finds its origins in *West New York v. Bock, supra,* 38 *N.J.* at 523, 186 *A.*2d 97, which addressed the necessary desire to promote proportionality and uniformity in the rendering of discipline of public employees. *Bock* involved a fireman who was dismissed from his position based on a pattern of tardiness. *Id.* at 503–06, 186 *A.*2d 97. The former Commission reduced the discipline, and the Appellate Division reduced it further. In affirming the Appellate Division's reduction of sanctions, we determined that just cause for dismissal could be found where there had been "habitual tardiness" or "chronic misconduct." *Id.* at 522, 186 *A.*2d 97. *Bock* further stated that although a "single instance" of aberrant conduct may not itself be sufficient for dismissal, "numerous occurrences over a reasonably short space of time, even though sporadic, may evi-

dence an attitude of indifference amounting to a neglect of duty" and, thus, constitute sufficient grounds for termination. *Ibid.* *Bock* reasoned that an employee's past record could properly be considered in fashioning the "appropriate penalty for the current specific offense," *id.* at 523, 186 *A.*2d 97, and defined "past record," as

> an employee's reasonably recent history of promotions, commendations and the like on the one hand and, on the other, formally adjudicated disciplinary actions as well as instances of misconduct informally adjudicated, so to speak, by having been previously called to the attention of and admitted by the employee.
>
> [*Id.* at 524, 186 *A.*2d 97.]

Thus, "a dismal disciplinary record can support an appointing authority's decision to rid itself of a problematic employee based on charges that, but for the past record, ordinarily would have resulted in a lesser sanction." *Herrmann, supra,* 192 *N.J.* at 32, 926 *A.*2d 350. *See also Carter, supra,* 191 *N.J.* at 483–84, 924 *A.*2d 525; *Karins v. City Atlantic City,* 152 *N.J.* 532, 562, 706 *A.*2d 706 (1998); *Polk, supra,* 90 *N.J.* at 578, 449 *A.*2d 7; *In re Hall,* 335 *N.J.Super.* 45, 46, 760 *A.*2d 1148 (App.Div.2000) (reinstating dismissal of police officer for alleged attempted theft when sufficient weight was not given to officer's previous violations); *In re Morrison,* 216 *N.J.Super.* 143, 147, 160–61, 523 *A.*2d 238 (1987) (poor record coupled with recent weighty suspension held to support dismissal of police officer after most recent incident).

"Since *Bock,* the concept of progressive discipline has been utilized in two ways": (1) to "ratchet-up" or "support imposition of a more severe penalty for a public employee who engages in habitual misconduct"; and (2) "to mitigate the penalty" for an employee who has a record largely unblemished by significant disciplinary infractions. *Herrmann, supra,* 192 *N.J.* at 30–33, 926 *A.*2d 350. On the other hand, progressive discipline is not "a fixed and immutable rule to be followed without question" because "some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." *Carter, supra,* 191 *N.J.* at 484, 924 *A.*2d 525. *See also Herrmann, supra,* 192 *N.J.* at 34–36, 926 *A.*2d 350. "Thus, progressive

discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." *Herrmann, supra,* 192 *N.J.* at 33, 926 *A.*2d 350 (explaining that progressive discipline is not necessary "when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest"); *see also Carter, supra,* 191 *N.J.* at 484–85, 924 *A.*2d 525; *Henry, supra,* 81 *N.J.* at 580, 410 *A.*2d 686; *Bowden v. Bayside State Prison,* 268 *N.J.Super.* 301, 306, 633 *A.*2d 577 (App.Div.1993), *certif. denied,* 135 *N.J.* 469, 640 *A.*2d 850 (1994).

## C.

We need not consider whether Stallworth's infractions related to the one hour and fifteen minute break are egregious enough to warrant termination without regard to his prior record of discipline. The ALJ noted Stallworth's prior record but determined that the present offenses related to the extended break were sufficiently egregious by themselves to warrant termination. The Commission disagreed, and the Appellate Division did not reject that conclusion. Rather, the Commission, in reviewing the current infraction in the context of Stallworth's entire work record, determined it was appropriate to reduce the penalty from removal to a four-month suspension after applying a progressive discipline approach, which included a cursory review of Stallworth's disciplinary record during his seventeen-year employment with the CCMUA. The Appellate Division took issue with the Commission's progressive discipline analysis and, in reversing, specifically found that the Commission underestimated the severity of Stallworth's prior history of discipline when determining his penalty.

In the context of the present appeal, we find that the meaning and significance of Stallworth's prior disciplinary record is unclear,

and that it is not possible to determine whether the Commission properly exercised its statutory authority when fixing Stallworth's penalty at a level less than the termination or removal from office as ordered by his employer. Indeed, in the record before us, there was considerable disagreement as to what constitutes a "major infraction" for purposes of Stallworth's employment, and how many "major" infractions Stallworth had. The Appellate Division employed the CCMUA's definition of "major infraction," which considers any violation of a workplace Critical Rule to be a "major" infraction. Under the CCMUA's definition, Stallworth would have up to fourteen major infractions. On the other hand, the Commission equated a "major infraction" with the term "major disciplinary action," which *N.J.A.C.* 4A:2–2.2(a) defines as a minimum suspension of more than five days.[6]

Under the Administrative Code, "major discipline" and "minor discipline" have defined meanings based on the quantum of punishment imposed. The terms do not categorize the seriousness or type of underlying incident, as opposed to the punishment imposed. As a result, mere reference to prior discipline does not provide the type of explanation a reviewing court must have in order to properly review whether the Commission appropriately exercised its authority in imposing discipline in the present case. Under the concept of progressive discipline, one act of misconduct may result in "minor discipline" merely because it was a first offense, whereas the same misconduct, if repeated, could justify the imposition of "major discipline," including termination. In other words, different penalties can be imposed for the same misconduct depending on the employee's record. Thus, the contextual nature of the prior offenses is a relevant consideration when analyzing an employee's disciplinary record, and renders incomplete and inadequate the Commission's imposition of discipline based on a summary conclusion that the employee's prior

---

[6] Stallworth is subject to *N.J.A.C.* 4A:2–2.2, because he is permanent employee in the career service under *N.J.A.C.* 4A:2–2.1. *See also N.J.S.A.* 11A:2–6 to –10.

disciplinary record contains "only" one incidence of "major" disciplinary action.

Here, the Commission and Appellate Division were considering the evidence of Stallworth's prior disciplinary record with divergent understandings of the impact of that record. To assure proper "progressive discipline," and a resulting penalty based on the totality of the work history, an employee's past record with emphasis on the "reasonably recent past" should be considered. *Bock, supra*, 38 *N.J.* at 524, 186 *A.*2d 97. This includes consideration of the totality of the employee's work performance, including *all* prior infractions. *See Carter, supra*, 191 *N.J.* at 484, 924 *A.*2d 525. As already noted, progressive discipline is a flexible concept, and its application depends on the totality and remoteness of the individual instances of misconduct that comprise the disciplinary record. The number and remoteness or timing of the offenses and their comparative seriousness, together with an analysis of the present conduct, must inform the evaluation of the appropriate penalty. Even where the present conduct alone would not warrant termination, a history of discipline in the reasonably recent past may justify a greater penalty; the number, timing, or seriousness of the previous offenses may make termination the appropriate penalty.

Here, although noting several minor infractions, the Commission gave short shrift to Stallworth's entire disciplinary record and emphasized the existence of a single "major disciplinary action," which resulted in a fifteen-day suspension. This approach erroneously suggests that the progressive discipline analysis disregards reasonably recent infractions and dictates that only the prior imposition of "major" disciplinary action may count to "ratchet up" the appropriate penalty. Moreover, the Commission did not address the concerns expressed by the CCMUA about reinstatement of an employee with Stallworth's record. The CCMUA's concerns focused on the need to deter its workforce from malingering, wasteful, and unproductive conduct and, concomitantly, to protect its public image by appropriate discipline of its employees. The

Commission focused exclusively on whether the individual employee's present infractions and prior *punishment* justified a particular penalty.

We cannot conclude from the Commission's statement of reasons that it adequately considered Stallworth's entire record of misconduct. We therefore hold that the Commission disregarded its statutory obligation to "state with particularity" its reasons for rejecting the ALJ's findings and conclusion. *N.J.S.A.* 52:14B–10. Thus, the result reached by the Appellate Division in reversing the Commission was correct.

However, its conclusion that the Commission understated or misperceived the true impact or significance of Stallworth's prior disciplinary history as a whole should not have translated into a reinstatement of the ALJ's decision merely because the panel determined that the record did not permit it to affirm the Commission's decision. Here there was confusion as to the significance or impact of the prior disciplinary record, a subject particularly within the expertise of the Commission. Therefore, given the concept of progressive discipline and the preeminent role of the Commission in the discipline of public employees, the matter should have been remanded to the Commission to permit a reexamination of the record and explanation by the Commission that adequately justifies any Commission determination to reject the appointing authority's termination of Stallworth. Stated differently, once the Appellate Division concluded that the Commission characterized Stallworth's record as having only one "major" infraction while the testimony before the ALJ indicated that Stallworth had at least eleven "critical violations," each of which were deemed to constitute "major discipline" by the CCMUA, it should have remanded the matter to the Commission for reconsideration and a more thorough explanation of the Commission's ultimate decision.

We now order that remand. The Commission must squarely address the discrepancy in evaluating the disciplinary record, explain with transparency its evaluation of Stallworth's disciplin-

ary record, and address the CCMUA's asserted concerns about the impact of reinstatement.

## IV.

As modified, the judgment of the Appellate Division is affirmed, and the matter is remanded to the Commission for reconsideration consistent with the principles embodied herein.

*For affirmance as modified/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA-SOTO, HOENS and STERN (temporarily assigned)—7.

*Opposed*—None.