**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0045-17T1

MARK FORD,

     Petitioner-Appellant,

v.

NEW JERSEY RACING
COMMISSION,

     Respondent-Respondent.

_____

              Submitted January 9, 2019 – Decided January 24, 2019

              Before Judges Nugent and Mawla.

              On appeal from the New Jersey Racing Commission, Agency No. NJRC-13-H-14-MD.

              Santoro and Santoro, attorneys for appellant (Dawn Marie Farinella, of counsel and on the brief).

              Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; George N. Cohen, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Mark Ford appeals from a July 25, 2017 decision by the New Jersey Racing Commission (Commission) adopting the initial decision by an Administrative Law Judge (ALJ) fining him $500 for violating N.J.A.C. 13:71-23.8(d). The ALJ concluded Ford had violated the aforementioned regulation when a horse he had trained won a race and subsequently tested positive for an excessive quantity of Lasix.[1] We affirm.

We take the following facts from the record. The parties stipulated that Ford is an equine trainer licensed by the Commission. They also stipulated Ford was the trainer of "Pembroke Dewey," a horse which raced in, and won, the fourth race at the Meadowlands Racetrack on April 26, 2014.

A hearing occurred in this matter over the course of two days before an ALJ. The following individuals testified: Ford; Dr. Thomas Tobin, a veterinary, toxicology, and pharmacology expert; Dr. Celeste Kunz, the Commission's contractor who administered the Lasix to Pembroke Dewey; and Dr. Barbara Greene, a veterinarian employed by the Commission. The ALJ found all of the testimony credible, except for Tobin's.

---

[1] "The diuretic furosemide (Lasix), given before a race, is the most commonly used drug in the treatment and prevention of bleeding." Md. Racing Comm'n v. Belotti, 744 A.2d 558, 562 n.5 (Md. Ct. Spec. App. 1999) (quoting James M. Griffin, M.D. & Tom Gore, D.V.M., Horse Owner's Veterinary Handbook at 222 (2d ed. 1998)).

A-0045-17T1

Ford testified that prior to the race either he, or a groom in his employ, took Pembroke Dewey to receive his Lasix injection. Ford requested five milliliters of Lasix. The permissible dose is between zero and ten milliliters. The veterinarian provided by the Commission administered the Lasix. Ford testified he did not insure the dose was correct.

Kunz, who administers the Lasix program at the racetrack, testified the groom who delivers the horse to her advises how much Lasix to administer. She confirmed Pembroke Dewey was administered Lasix prior to his race.

Greene testified that after a horse wins a race it is taken to detention with a handler designated by the trainer. After it is washed and cooled down, it is then taken to a stall where a urine and blood sample are collected and sealed. As recounted by the ALJ, Greene explained in detail the process for the urine and blood withdrawal. She testified that she and her assistant confirm they have the correct horse by checking its tattoo number. She explained the blood is withdrawn by a needle placed in the horse's vein and then extracted by three successive vacuum tubes. She stated it is not common to miss the vein. She can identify when she is in the vein because the blood is immediately sucked into the tube. She also explained if there had been a problem with the pre-race Lasix

3

injection the horse may have a welt, in which case, she would extract the blood from the opposite side of the horse in order to avoid the welt.

According to Greene, the blood is taken to the office, spun in a centrifuge, and separated for testing. The blood and urine samples are then given corresponding identification numbers to identify them with the same horse. The blood samples are locked in a refrigerator until they are shipped by express mail courier to the laboratory utilized by the Commission. Greene could not recall the details of how she took the samples from Pembroke Dewey or why his Lasix readings were so high. However, her notes recorded no problems with the extractions taken from the horse.

Tobin testified the pre-race Lasix injection must be inside the vein. He testified injecting Lasix extra-vascular, or outside the vein, would contaminate the post-race sample. He stated the post-race sample must be withdrawn from the side of the horse opposite the Lasix injection, so as to not draw from the extra-vascular area near the site of the Lasix injection, and thus draw a contaminated sample.

Tobin offered no credible evidence to establish the aforementioned standards, save for a booklet from a 1998 seminar on furosemide. He testified the booklet served as authority for the rule that post-race samples should be

A-0045-17T1

withdrawn from the opposite side of the horse. According to Tobin, the booklet memorialized a "scientific dialogue at a seminar . . . convened to discuss matters associated with furosemide and its regulation." However, Tobin could only identify one of the speakers quoted in the booklet and not the other authorities partaking in the dialogue, which produced the alleged standard.

Tobin did not examine Pembroke Dewey. He also testified he did not know the method and amount of Lasix administered to the horse, and did not know the extraction location for the post-race blood sample. Yet Tobin concluded the Lasix injection was done improperly and was extra-vascular. He also concluded the post-race blood sample was not taken from the opposite side of the horse, but rather from an extra-vascular area, which contained contaminants. He also claimed the laboratory had not tested the specific gravity of the horse's urine, and if it did, it would exculpate Ford because a "[h]igher specific gravity simply means the Lasix had no effect on the concentration of urine."

The ALJ concluded as follows:

> Dr. Tobin's testimony was problematic. While I am sure he testified truthfully, I cannot find his testimony credible. He was unprepared to testify. He did not seem to be fully aware of the [laboratory] report. . . . Further, his testimony as to why the blood sample tested so high for Lasix is based entirely on conjecture. He

5

> opined that but for a mistake in drawing the sample there is no other explanation for the high Lasix reading. I cannot give weight to his testimony as it is not based on anything other than speculation. I deem him not credible.

The judge noted pursuant to N.J.A.C. 13:71-23.6, Ford was responsible for the condition of the horse, compliance with regulations adopted by the Commission regarding the administration of medicine and substances administered to the horse, and protecting the horse from the administration of substances not permitted by the Commission. The judge concluded the Lasix in the post-race sample taken from Pembroke Dewey exceeded the amount permitted by N.J.A.C. 13:71-23.8(d), which made Ford strictly liable under N.J.A.C. 13:71-23.6.

In determining the sanction for Ford's violation, the judge noted he had "four previous Lasix violations." Although N.J.A.C. 13:71-23.8(e) permitted the imposition of a greater sanction due to Ford's violations, the judge imposed a $500 fine, the penalty associated with a second violation, pursuant to N.J.A.C. 13:71-23.8(e)(2).

The Commission adopted the ALJ's determination. This appeal followed.

A-0045-17T1

I.

"[We] have 'a limited role' in the review of [agency] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "[A] 'strong presumption of reasonableness attaches to [an agency decision].'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). "In order to reverse an agency's judgment, [we] must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579-80). The burden of proving an agency action is arbitrary, capricious, or unreasonable is on the challenger. Bueno v. Bd. of Trs., 422 N.J. Super. 227, 234 (App. Div. 2011).

We "may not substitute [our] own judgment for the agency's, even though [we] might have reached a different result." Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 483 (2007)). "It is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 355 (App. Div. 2010)

A-0045-17T1

(alteration in original) (quoting Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001)).

Under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, "[i]n reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so." N.J.S.A. 52:14B-10(c). However, "generally it is not for [courts] or the agency head to disturb [the ALJ's] credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing." H.K. v. State, 184 N.J. 367, 384 (2005).

On appeal, Ford attacks the ALJ's credibility determinations. He argues the ALJ erred in rejecting Tobin's testimony where the Commission had presented no expert to rebut it. He contends the ALJ improperly relied upon the Commission's laboratory results and placed undue weight on the testimony of the veterinarians who had administered the Lasix to the horse. Ford argues there was no testimony offered regarding the chain of custody of the blood samples after they were extracted and sent for testing. We are unpersuaded by these arguments.

A-0045-17T1

We reject Ford's challenges to the ALJ's credibility determinations.  The ALJ offered detailed reasoning as to why he rejected Tobin's testimony, and given the deference accorded to such determinations, we find no error.  Indeed, as we noted, Tobin's testimony was speculative because he had not examined the horse and there were no facts to corroborate his theory the pre-race Lasix injection was performed improperly or that the post-race blood sample extraction was from the allegedly compromised Lasix injection point.  Furthermore, there was no credible scientific basis to support Tobin's theory.  His reliance on a seminar pamphlet, which he inadequately attempted to tie to a credible authority on equine furosemide administration, fell short of credible testimony.  Given Tobin's lack of credibility, and the evidence and testimony from Kunz and Greene discrediting his theory, the Commission was not required to adduce expert testimony of its own to rebut his.

We also reject Ford's challenge to the Commission's determination regarding the chain of custody of the samples taken from Pembroke Dewey.  We have stated:

> The determination whether the chain of custody of a . . . sample has been sufficiently established to justify admission of test results is committed to the discretion of the trier of fact.  See State v. Morton, 155 N.J. 383, 446-47 (1998); State v. Brunson, 132 N.J. 377, 393 (1993).  Such evidence should be admitted if there is a

"reasonable probability that the evidence has not been changed in important respects." Id. at 393-94 (quoting State v. Brown, 99 N.J. Super. 22, 28 (App. Div. 1968)). Thus, it is not necessary for the party introducing such evidence "to negate every possibility of substitution." Brown, 99 N.J. Super. at 27; see generally McCormick on Evidence § 212 (Strong ed., 5th ed. 1999).

Although the reported New Jersey appellate decisions involving chain of custody issues have all been criminal cases, it is even clearer in an administrative proceeding that a party seeking to introduce drug test results only needs to show a "reasonable probability" that the integrity of the sample has been maintained, because a relaxed standard of admissibility of evidence applies in administrative proceedings.

[In re Lalama, 343 N.J. Super. 560, 565-66 (App. Div. 2001).]

As we noted, Kunz's testimony demonstrated no error in the pre-race administration of Lasix to support Tobin's theory the substance had been administered outside of the horse's vein. Greene's testimony demonstrated no errors in the extraction of the post-race samples or that the extraction was from an area of the horse compromised with Lasix. Furthermore, Greene testified in detail, and without rebuttal, to the handling of the samples and their transmittal to the laboratory for testing. The record more than supports the conclusion there was a reasonable probability the integrity of the samples had been maintained within the chain of custody.

Finally, given the numerous problems with Tobin's testimony and credibility, as noted by the ALJ, his claim a specific gravity test of the horse's urine would exculpate Ford was unsupported and conjectural. The Commission's decision was not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0045-17T1