# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3995-17T2

C.A.,

      Petitioner-Appellant,

v.

DEPARTMENT OF
HUMAN SERVICES,

      Respondent-Respondent.

_____

Argued November 7, 2019 – Decided January 7, 2020

Before Judges Koblitz, Whipple and Gooden Brown.

On appeal from the New Jersey Department of Human Services, Office of Program Integrity and Accountability.

Barbara E. Ungar telephonically argued the cause for appellant.

Marie Linette Soueid, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Marie Linette Soueid, on the brief).

PER CURIAM

C.A. appeals from a Final Agency Decision of the Department of Human Services (DHS) ordering the placement of his name on the Central Registry of Offenders against Individuals with Developmental Disabilities (Central Registry). We affirm.

We discern the following facts from the record, which includes video footage of the incident. C.A. worked for Benchmark Human Services (BHS) in Branchburg, a group home for developmentally disabled persons. R.F. was a developmentally disabled man, diagnosed with impulse control disorder and seizures, who resided in the BHS group home and received services from the New Jersey Division of Developmental Disabilities (DDD). R.F. suffered from dysphagia, meaning he had difficulty swallowing and was at a high risk for choking.

R.F. had an individual habilitation plan (IHP) which called for a "chopped diet" and required he be given reminders to slow down when eating. R.F. also had to have one-on-one supervision when he was out in the community and could not be left alone in a vehicle. Additionally, R.F. was required to be within arm's length of his supervisor where food was present. R.F.'s IHP also required his supervisor to call 911 in an emergency.

2

On February 5, 2014, C.A. and another staff member, V.E., took R.F. and two other residents to ShopRite to purchase toiletries for the group home. Once at ShopRite, V.E. suggested C.A. remain in the car with R.F. and another resident. However, C.A. decided they would all have to go into the store together, since V.E. had not yet completed enough training to be left alone with the residents. While inside, R.F. tried to grab a cake in the bakery section, and C.A. stopped him. However, when C.A. was out of arm's reach of R.F., R.F. was able to access the cake, shoved it in his mouth, and began pacing and walking in circles before collapsing on the floor. V.E. then ran to get water, which he and C.A. tried to give R.F. to no avail. C.A. did not render first aid to R.F., nor did he call 911. Another individual in the grocery store called 911, and according to a responding police officer, C.A. was evasive and lied to them numerous times about his connection to R.F. While the responding officer and others administered CPR, C.A. spoke to his supervisor on the phone, who instructed him to accompany R.F. to the hospital. R.F. later died. Following the incident, C.A. was questioned by police and gave written statements to the DDD and BHS. He was subsequently fired from BHS. C.A. was charged with endangering the welfare of an incompetent person, N.J.S.A. 2C:24-7, a disorderly person's offense, but was acquitted.

After an investigation, DHS determined that C.A. had neglected R.F. by failing to provide one-on-one supervision, as well as by failing to render any aid or call 911, which resulted in "major injuries from choking." DHS advised C.A. by letter that his name would be placed on the Central Registry, authorized by N.J.S.A. 30:6D-77, and advised him of his right to appeal.

C.A. appealed, and the matter was transmitted to the Office of Administrative Law. A closed hearing was held before an Administrative Law Judge (ALJ) to determine whether DHS acted reasonably in placing C.A. on the Central Registry. DHS presented testimony from its investigator, Robert Brozon, and the two responding Branchburg Police Officers. C.A. did not testify and offered no witnesses.

The ALJ issued a decision on October 30, 2017, finding that C.A. "exhibited seriously poor judgment which created a substantial and unjustifiable risk of harm to R.F." C.A. filed exceptions to this determination with the DHS, and DHS filed responses.

DHS upheld the ALJ's finding of neglect. DHS determined the ALJ reasonably found that C.A. had neglected R.F., and that C.A., through his actions on February 5, 2014, "was grossly negligent and reckless in his conscious disregard of the danger in his failure to provide sufficient care" to R.F. Due to

4

C.A.'s grossly negligent and reckless neglect of R.F., DHS concluded C.A. belonged on the Central Registry, and issued its final agency decision on March 28, 2018. This appeal followed.

"[We] have 'a limited role' in the review of [administrative agency] decisions." In re Stallworth, 208 N.J. 182, 194 (2011). (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "[A] 'strong presumption of reasonableness attaches to [an agency decision].'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). "In order to reverse an agency's judgment, [we] must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579); In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013).

> In determining whether agency action is arbitrary, capricious, or unreasonable, [we] must examine:
>
> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not

5

> reasonably have been made on a showing of the relevant factors.
>
> [Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

C.A. asserts his actions did not constitute gross negligence or recklessness, and that he thus should be removed from the Central Registry. He argues the incident was not his fault, and that his employer, BHS, bears responsibility. C.A. also argues the video shows he acted properly in dealing with R.F., noting he stayed with R.F., attempted to sit him up, gave him water, and deferred to the treatment of trained medical staff when they arrived. For these reasons, C.A. asserts the ALJ's determination of substantial acts of neglect was not based on substantial evidence in the record. Additionally, C.A. contends that hospital records and a DHS incident report suggest R.F. died from seizure-related complications, which should have precluded the ALJ from considering R.F.'s death as a factor in rendering her decision finding substantial acts of neglect on the part of C.A. Further, C.A. argues he took the proper steps, and remaining with R.F. was the appropriate response given his basic level of training when dealing with a complicated medical scenario.

C.A. also argues the ALJ did not view the video evidence in its entirety and allowed Investigator Brozon to give improper lay opinion testimony.

Additionally, C.A. suggests the ALJ did not give proper consideration to C.A.'s statements. We reject all of C.A.'s arguments.

Under the Central Registry Act, DHS conducts investigations into reported allegations of abuse, neglect, and exploitation of developmentally disabled individuals. N.J.S.A. 30:6D-76. Neglect is defined as "willfully failing to provide proper and sufficient food, clothing, maintenance, medical care, or a clean and proper home; or failing to do or permit to be done any act necessary for the well-being of an individual with a developmental disability." N.J.S.A. 30:6D-74; see also N.J.A.C. 10:44D-1.2. Neglect can occur where a caretaker "place[s] [an] individual [with a developmental disability] in harm's way." N.J.A.C. 10:44D-4.1(c).

A caregiver is placed on the Central Registry when he or she "acted with gross negligence, recklessness, or in a pattern of behavior that causes or potentially causes harm to an individual with a developmental disability." N.J.S.A. 30:6D-77(b)(2). A caregiver acts with "gross negligence" by acting with a "conscious, voluntary act or omission in reckless disregard of a duty and of the consequences to another party." N.J.A.C. 10:44D-4.1(c)(1). Acting with "recklessness" is the "creation of a substantial and unjustifiable risk of harm to others by a conscious disregard for that risk." N.J.A.C. 10:44D-4.1(c)(2).

Whether particular conduct constitutes gross negligence or reckless behavior under N.J.S.A. 30:6D-77(b)(2) and N.J.A.C. 10:44D-4.1 is a question of law. N.J. Div. of Youth & Family Servs. v. A.R., 419 N.J. Super. 538, 542-43 (App. Div. 2011).

The focus of the law is on the conduct of the caregiver, not the effect on the victim. N.J.S.A. 30:6D-74; N.J.S.A. 30:6D-77(b)(2); N.J.A.C. 10:44D-1.2. Therefore, the issue here is whether C.A. failed to provide adequate care to R.F. or ensure his well-being. See N.J.S.A. 30:6D-74; N.J.A.C. 10:44D-1.2; N.J.A.C. 10:44D-4.1(c)(1); and N.J.A.C. 10:44D-4.1(c)(2). Our review of the record demonstrates there is adequate support for the conclusion he did not.

R.F.'s IHP stated he could not be left alone in a vehicle, required one-on-one supervision in the community, and arms-length supervision where food was present. Staff were required to call 911 in the event of a life-threatening emergency. BHS defines a life threatening emergency as one where a prudent person could reasonably believe immediate intervention was necessary; these circumstances include unresponsiveness to pain or stimuli, loss of consciousness, confusion, or difficulty breathing. C.A. was familiar with R.F.'s IHP and other policies of BHS, and he was trained in CPR and first aid.

C.A. went with R.F. to the grocery store with a coworker and three BHS residents and left the van with R.F. and another resident, which was in violation of R.F.'s one-on-one supervision requirement. C.A. was not supervising R.F. when he ate the cake, nor was he within arm's reach of R.F. as required by R.F.'s IHP. C.A. did not give CPR, remove anything from R.F.'s mouth, or notify anyone about R.F.'s disabilities. Rather, C.A. stood watching, failed to give responding officers information about R.F.'s disabilities, and was evasive when responding officers asked him questions about R.F. C.A. was not the person who called 911, although he did call the group home to notify them. It is undisputed that C.A. was aware of R.F.'s condition and need for supervision around food.

The findings of fact made by the ALJ were amply supported by the evidence presented at the hearing, including the video, testimony, accompanying investigative reports, and police reports. Additionally, the ALJ heard testimony from Investigator Brozon and two responding officers from the Branchburg Police Department.

C.A. does not dispute any of these facts specifically, but rather generally registers dissatisfaction with the decision of the ALJ and DHS. He contends the ALJ may not have viewed the ShopRite surveillance video in its entirety but

relied instead on the portions shown during Investigator Brozon's testimony. C.A. also argues the ALJ should not have considered Investigator Brozon's testimony because he was not present at the incident.

Our Rules of Evidence for court proceedings do not strictly apply to administrative hearings. See N.J.S.A. 52:14B-10; N.J.A.C. 1:1-15.1 to -15.12; see also Delguidice v. New Jersey Racing Comm'n, 100 N.J. 79, 84 (1985). Nonetheless, evidence rulings in administrative matters "shall be made to promote fundamental principles of fairness and justice and to aid in the ascertainment of truth." N.J.A.C. 1:1-15.1(b). The administrative tribunal is thus empowered to "exclude any evidence if its probative value is substantially outweighed by the risk that its admission will . . . [c]reate substantial danger of undue prejudice or confusion." N.J.A.C. 1:1-15.1(c)(2).

In his testimony, Investigator Brozon described the surveillance video in his capacity as a DHS investigator who substantiated the claim of neglect. The video evidence was presented as evidence on which his investigation relied.

We reject C.A.'s attempt to shift blame to BHS for inadequate training. The ALJ's finding of gross negligence was not predicated upon C.A.'s failure to provide specialized care or treatment to R.F., but was based on C.A.'s failure to provide adequate supervision in line with R.F.'s IHP, as well as failure to render

aid after R.F. collapsed to the ground. For these reasons, the decision of DHS to list C.A. on the Central Registry was supported by clear evidence on the record.

Placement on the Central Registry gives rise to a significant liberty interest, and we agree C.A. was entitled to effective assistance of counsel consistent with our decision in New Jersey Division of Youth & Family Services v. V.M., 408 N.J. Super 222, 237-238 (App. Div. 2009). However, C.A.'s attorney's alleged deficiencies, including failure to call witnesses, including C.A., not engaging an expert to testify, and stipulating or failing to object to evidence submitted at the hearing, do not demonstrate C.A. was actually prejudiced in his case. C.A. did not explain what precise exculpatory evidence was not presented.

The Strickland v. Washington Court announced a simple, two-part test for evaluating claims of "actual ineffectiveness" of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the

conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

[466 U.S. 668, 687 (1984).]

C.A. has failed to demonstrate his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" him by the Sixth Amendment. Ibid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

12

A-3995-17T2