**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3736-19

FRITS TISSERAND,

    Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

    Respondent.

_____

Submitted November 10, 2021 – Decided February 9, 2022

Before Judges Fuentes and Gilson.

On appeal from the New Jersey Department of Corrections.

Frits Tisserand, appellant pro se.

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Stephanie M. Mersch, Deputy Attorney General, on the brief).

PER CURIAM

Frits Tisserand appeals from a final agency decision by the Department of Corrections (Department), which imposed disciplinary sanctions on him while he was serving a sentence in State prison for encouraging others to riot in violation of prohibited act *.252, N.J.A.C. 10A:4-4.1(a). We reverse because the finding of guilt was not supported by substantial credible evidence.

I.

The charge against Tisserand arose out of a disturbance that occurred at Southern State Correctional Facility (Southern) in April 2020, during the COVID-19 pandemic. At that time, Tisserand was an inmate at Southern and he was housed in "Unit 2-Right" (Unit 2). That unit, which consisted of several wings and a common day-space area (the common area), had been designated as a "quarantine unit" for housing inmates who had been exposed to other inmates or staff who had symptoms of COVID-19.

By the morning of April 9, 2020, there were forty inmates housed in Unit 2. That day, Department staff began moving thirty-five additional inmates from other housing units to Unit 2. After twenty-three of those new inmates had been moved in, inmates already in Unit 2 began to demand that no additional inmates should be brought to Unit 2. Sometime after 9 p.m., as the twelve remaining new inmates were being processed into Unit 2, some inmates entered the Unit's

A-3736-19

common area and demanded that no additional inmates be moved into Unit 2. The inmates were shouting and making threats both to staff and the twelve inmates being moved in. Custody staff called a "lock-up" that required all inmates to return to their bunks in the wings to be counted.

Some inmates in Unit 2 ignored that direction and remained in the common area. At approximately 9:40 p.m., several inmates pushed a table against the gate leading to the Unit attempting to block anyone from entering Unit 2. A Department officer repeatedly instructed all inmates in Unit 2 to return to their bunks, but the inmates already in the common area remained there. Corrections officers who were monitoring the Unit via surveillance cameras did not observe any inmates leave the common area and return to their bunks.

In response to this situation, the Department's Special Operations Group and a K-9 dog unit were sent to Unit 2 to restore order. By the early morning hours of April 10, 2020, all sixty-three inmates in Unit 2 had been secured, identified, processed, and transferred to a quarantine unit at South Woods State Prison. No staff or inmates were reported to be injured during the incident.

A-3736-19

Tisserand was charged with committing prohibited act *.252, encouraging others to riot. [1] The other sixty-two inmates were also charged with committing prohibited act *.252 or other prohibited acts. Tisserand was served with the charge on April 11, 2020. Thereafter, he was assigned counsel substitute and pled not guilty.

A hearing was conducted over several days between April 13, 2020, and April 29, 2020. The evidence presented at the hearing included seven hours of video footage from the incident at Unit 2 on April 9 and 10, 2020, witness statements, and staff reports. The evidence was used against all sixty-three inmates alleged to have participated in the disturbance.

Due to the COVID-19 pandemic, live testimony was not presented; instead, witnesses submitted written statements and Tisserand, and the other inmates, had the right to submit written questions to those witnesses. Tisserand also made a statement in which he claimed he was in the wing near his bunk talking with other inmates and packing up his "stuff because [he] knew

---

[1] On January 15, 2021, the Department adopted amendments to Title 10A Chapter 4 Inmate Discipline. One of the amendments consolidated prohibited act *.252, encouraging others to riot, with *.251, rioting. As such, the current administrative code reads "*.251 rioting or encouraging others to riot." See N.J.A.C. 10A:4-4.1(a)(1) (2021); 53 N.J.R. 923(a) (May 17, 2021).

something bad was happening." Statements from other inmates corroborating Tisserand's account were also submitted.

Based on the evidence, the hearing officer found that Tisserand was part of a large group of inmates who acted in concert, the inmates were repeatedly ordered to go to their wings for counting, Tisserand heard and ignored the orders, and Tisserand was part of a group of inmates encouraging other inmates to riot. In making those findings, the hearing officer did not credit the statements from Tisserand or the other inmates who supported Tisserand's statement. Instead, the hearing officer found that those statements were suspect because the inmates were essentially supporting each other for their own self-interests.

The hearing officer noted that the evidence did not identify the specific role of each inmate, in part because the inmates were wearing COVID-19 masks and gathered in large groups. Nevertheless, the hearing officer found that all the inmates had been given specific orders to return to their bunks, they disobeyed those orders, and that non-compliant behavior encouraged other inmates not to comply.

After he was found guilty of prohibited act *.252, Tisserand was sanctioned to 210 days of administrative segregation, ninety days of lost commutation time, and ten days of lost recreational privileges. In imposing

those sanctions and rejecting Tisserand's arguments for leniency, the hearing officer found that the behavior could have led to violence and needed to be deterred. The hearing officer also noted that Tisserand did not have a prior history of discipline and, therefore, the hearing officer did not impose the maximum sanctions allowable.

Tisserand administratively appealed. On May 7, 2020, an Assistant Superintendent, acting for the Department, issued a final agency decision upholding the finding of guilt and the sanction imposed. Tisserand now appeals to us.

## II.

On this appeal, Tisserand makes four arguments, contending (1) his due process rights were violated; (2) the hearing officer ignored certain evidence; (3) there was insufficient evidence establishing that he encouraged others to riot; and (4) his counsel substitute was ineffective. Having reviewed the record, we hold that there was insufficient evidence to establish that Tisserand encouraged others to riot.

Our review of an agency determination is limited. In re Stallworth, 208 N.J. 182, 194 (2011); Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997). We will not reverse a decision of an administrative agency unless it is "arbitrary,

6

capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole." <u>Stallworth</u>, 208 N.J. at 194 (quoting <u>Henry v. Rahway State Prison</u>, 81 N.J. 571, 579-80 (1980)).

The Department has broad discretion in matters regarding the administration of a prison facility, including disciplinary infractions by prisoners. <u>Russo v. N.J. Dep't of Corr.</u>, 324 N.J. Super. 576, 583 (App. Div. 1999). "Prisons are dangerous places, and the courts must afford appropriate deference and flexibility to administrators trying to manage this volatile environment." <u>Id.</u> at 584. "A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" <u>Stallworth</u>, 208 N.J. at 194 (quoting <u>In re Carter</u>, 191 N.J. 474, 483 (2007)). Nevertheless, "our review is not 'perfunctory,' nor is 'our function . . . merely [to] rubberstamp an agency's decision[.]'" <u>Blanchard v. N.J. Dep't of Corr.</u>, 461 N.J. Super. 231, 239 (App. Div. 2019) (alterations in original) (quoting <u>Figueroa v. N.J. Dep't of Corr.</u>, 414 N.J. Super. 186, 191 (App. Div. 2010)). Instead, "[w]e are constrained to engage in a 'careful and principled consideration of the agency record and findings.'" <u>Ibid.</u> (quoting <u>Williams v. Dep't of Corr.</u>, 330 N.J. Super. 197, 204 (App. Div. 2000)).

The DOC regulations provide that "[a] finding of guilt at a disciplinary hearing shall be based upon substantial evidence that the inmate has committed a prohibited act."  N.J.A.C. 10A:4-9.15(a).  Substantial evidence needed to sustain guilt of an infraction is "such evidence [that] a reasonable mind might accept as adequate to support a conclusion."  Figueroa, 414 N.J. Super. at 192 (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)).  In addition, the hearing officer must specify the evidence relied on in making a finding of guilt.  N.J.A.C. 10A:4-9.15(b).

Prohibited act *.252 states that a prisoner is subject to major discipline for "encouraging others to riot."  N.J.A.C. 10A:4-4.1(a)(1)(xii).  The regulations do not define "encouraging" or "riot."  See N.J.A.C. 10A:4-1.3 (setting forth definitions for inmate discipline, but that provision does not define "encouraging" or "riot").

Tisserand was not charged with participating in the riot.  Accordingly, we focus on whether there was evidence that Tisserand encouraged other prisoners to riot.  The ordinary dictionary meaning of "encourage" is to make someone "more determined" or "more likely to do something," or to make something "more appealing or more likely to happen."  Encourage, Merriam-Webster,

https://www.merriam-webster.com/dictionary/encourage (last visited Jan. 25, 2022).

The hearing officer's and Department's decision focused and relied on the surveillance video from Unit 2 and the written testimony of corrections officers. The hearing officer found that the surveillance video showed "a majority" of the inmates congregating in the common area. The hearing officer acknowledged that the inmates could not be identified on the video because they were wearing masks or facing away from the camera. Nonetheless, the hearing officer found that the video shows inmates in the common area "did not disperse," because no inmate, "after receiving warnings, complied with staff orders."

Neither the hearing officer nor the Department made any explicit finding concerning Tisserand. He was not identified in the video and no officer testified that Tisserand was in the common area during the incident, that he encouraged others to participate in the riot, or that he failed to return to his bunk. Instead, the Department relies on a general finding that no inmate was seen leaving the common area after being ordered to do so. That general finding does not furnish a reasonable basis for concluding that Tisserand encouraged others to riot.

Tisserand contended that he was not in the common area when the disturbance took place; rather, he submitted a written statement that he was in

9

A-3736-19

his wing near his bunk bed. He supported that contention with two written statements from other prisoners. The hearing officer did not find those statements credible, reasoning that the inmate-witnesses had the opportunity to collaborate on their stories while quarantined together after the incident. Although the hearing officer acted within her discretion in making that determination, she identified no evidence to support a finding that Tisserand encouraged others to riot.

Instead, the hearing officer reasoned that "an [inmate's] specific role in the disturbance is not relevant" because "[a]ny behavior that is not compliant with staff orders can be viewed as encouraging non-compliant behaviors from others." That reasoning does not establish substantial credible evidence that Tisserand encouraged others to riot because there was no evidence that Tisserand was even in the common area. Consequently, there was not even a showing that Tisserand did not comply with the order to return to his bunk.

We are mindful of the need for security and safety at prisons. We are also aware that the Department has greater expertise than we do in assessing safety and security at its facilities. Basic due process, however, requires that there be some evidence that a particular prisoner encouraged a situation; a prisoner cannot be found guilty simply because he or she was in the Unit where the

situation occurred. "[D]isciplinary actions against inmates must be based on more than a subjective hunch, conjecture[,] or surmise of the factfinder." Figueroa, 414 N.J. Super. at 191.

Having determined that there was insufficient evidence to support the charge, we need not address Tisserand's other arguments. The finding of guilt of prohibited act *.252 is reversed and the sanctions imposed are vacated.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION