# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2697-22

NEW JERSEY DEPARTMENT
OF CHILDREN AND FAMILIES,

     Petitioner-Respondent,

v.

R.L.,

     Respondent-Appellant.

_____

Argued November 20, 2024 – Decided April 7, 2025

Before Judges Mayer, DeAlmeida and Puglisi.

On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Case ID No. 17384537.

Victoria D. Miranda argued the cause for appellant (SeidenFreed, LLC, attorneys; Faith A. Ullmann, of counsel; Dina M. Mikulka and Victoria D. Miranda, on the briefs).

Christina Duclos, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney

General, of counsel; Alicia Y. Bergman, Deputy
Attorney General, on the briefs).

Jeralyn L. Lawrence argued the cause for amicus curiae
New Jersey State Bar Association (NJ State Bar
Association and Lawrence Law, LLC, attorneys;
Timothy F. McGoughran, of counsel and on the brief;
Jeralyn L. Lawrence, Matheu D. Nunn, and Brian G.
Paul, on the brief).

PER CURIAM

Respondent R.L. (Rick)[1] appeals from the April 18, 2023 final agency decision of the Division of Child Protection and Permanency (DCPP or the Division) that allegations he sexually abused his sons were "not established" pursuant to N.J.A.C. 3A:10-7.3(c)(3). We reverse.

I.

Rick and Adam were married in 2015. They have two sons, Noah and Justin, conceived through surrogacy with both parents biologically related to the children. Rick was the stay-at-home caretaker of the boys during the marriage. Rick and Adam separated in July 2021, and Adam filed a complaint for divorce in the Family Part in August 2021. At that time, Noah was three-and-a-half years old and Justin was two years old.

---

[1] We use initials and pseudonyms to identify the parties and their children to protect the confidentiality of records relating to allegations of abuse and neglect of children in accordance with Rule 1:38-3(d)(12) and N.J.S.A. 9:6-8.10a(a).

A-2697-22

On September 12, 2021, a Family Part judge issued a temporary restraining order (TRO) against Rick based on allegations he assaulted Adam while Adam was holding one of the children. DCPP received a referral due to entry of the TRO. After an investigation, the Division issued a finding of "not established" with respect to the domestic violence referral.

On April 14, 2022, DCPP received a second referral with respect to the family. The nature of that referral is not clear from the record. After an investigation, the Division issued a finding of "not established" with respect to the second referral.

On June 29, 2022, a Family Part judge entered a final restraining order (FRO) against Rick and granted full custody of the children to Adam. Entry of the FRO precipitated a new referral to the Division.

On July 12, 2022, a Family Part judge entered an order establishing joint legal custody of the children to Rick and Adam with Adam as the parent of primary residence and Rick as the parent of alternate residence, and granting Rick parenting time two overnights every week and one day every weekend. The parties continued to dispute custody.

In August 2022, Adam enrolled the children in play therapy with Debbie Mann, LCSW, without Rick's consent and over his objection.

A-2697-22

Adam subsequently alleged Rick repeatedly pinched and hit the children and smoked marijuana in front of them. Adam's allegations led to a new referral to the Division.

On October 6, 2022, a Family Part judge entered an order to show cause filed by Adam. The order to show cause suspended Rick's parenting time with both children and gave DCPP time to "conduct its investigation and report back . . . ."

On October 12, 2022, Mann contacted the Division. She said Adam told her Noah had disclosed that "Papai," the name he used for Rick, put a finger in his butt and that Noah made comments to his nanny about putting penises in butts. Adam also sent Mann a video of Noah saying Rick "will shoot Ms. Debbie with a gun."[2] Mann alerted the police departments in the towns in which she had an office of Rick's threat.[3] Mann acknowledged that she obtained most of the information she reported to the Division from Adam, never met Rick, and was aware of the ongoing divorce proceedings and custody dispute involving Adam and Rick.

---

[2] In the video included on appeal, Noah told Adam that Rick wanted to "shoot Miss Debbie with a gun" and that Rick "likes to shoot people."

[3] One police department contacted Rick. He denied having threatened Mann. No charges were filed, and Rick was notified not to appear at Mann's offices.

A-2697-22

Also on October 12, 2022, the Division received collateral information from the children's pediatrician stating no child abuse or neglect concerns, with the last visit for Noah the day prior and the last visit for Justin six days earlier.

Later that day, a DCPP worker spoke with Noah at Adam's home. Noah did not disclose sexual abuse. The next morning, Noah's nanny emailed the DCPP worker and told him that after he left the home, Noah asked her to touch his butt when he undressed himself to take a shower. When the nanny told Noah no because no one can touch his butt, he replied "but Papai does." The nanny sought clarification by asking if Noah was referring to when Papai puts eczema cream on his skin. Noah replied, "no, he touch me inside."

On October 16, 2022, Adam reported allegations of Rick's sexual abuse of both children to the local police department. Adam stated that after he showed the children a video about good touches and bad touches, both Noah and Justin said they had received a "bad touch" by Rick. Adam also reported that Noah asked him, "did you know you can stick your pee pee in a butt?" and if he was "going to stick his finger in his butt before he goes into the shower like [Rick]?" Adam reported that Justin asked the nanny, "did you know that you can stick your finger in the butt?" A report created by the police department included Adam's comment that he believed Rick had been sexually abused as a

child and used cocaine, ecstasy, ketamine, alcohol, and marijuana. The police department thereafter made a referral to DCPP.

Later that day, a Division worker went to Adam's home. Adam told her that a week earlier, while giving Noah a shower, Noah asked Adam to stick his fingers in his butt. When Adam asked Noah where he learned that, Noah said, "Papai does that to [me]." Adam said he recorded the disclosure and showed the police.[4] Adam also reported Justin made similar disclosures. Noah and Justin would not talk to the DCPP worker, who observed a very close bond between the children and Adam.

Adam advised he was interested in having the children evaluated at the Metro Regional Diagnostic Treatment Center (RDTC), a facility focused on children who experience sexual abuse, "as per his lawyer." Adam told the Division worker "the allegation carries more weight in court if DCPP completes the referral." The worker informed Adam the Division "must remain neutral." Adam responded that he planned on requesting the family court order Rick's visits be supervised and "no 50/50 custody." Adam also stated that Mann "will not go on record regarding abuse if not received from first-hand knowledge."

---

[4] This recording is not in the record.

A-2697-22

The police department notified the county prosecutor's office of Adam's allegations. On October 18, 2022, the county prosecutor's office informed the Division the prosecutor's case was closed, as "no disclosure was obtained from the child" and "the claim was no (sic) credible after review of the DCPP investigator and SPRU contact notes."[5]

The same day, the Division received collateral information from the children's daycare provider that Noah "recently started to create stories that aren't tru[th]ful." Noah's untrue stories included a pet snake loose in the family home and a fire that burned the family home to the ground.

On October 19, 2022, Mann reported Noah "presented with distress" at a therapy session and said that "Papai puts his peepee in my butt." Noah's nanny was present at the session at the child's request, and Noah's disclosure happened when the nanny began to discuss shower time. When Mann attempted to explore Noah's feelings, "he became visibly distressed and appeared to dissociate."

Mann completed a report detailing the therapy session and, although she never met Rick, recommended he complete a psychosexual evaluation and undergo a forensic psychiatric evaluation to determine his propensity for

---

[5] SPRU is the acronym for the Special Response Unit, an after-business-hours DCPP response team.

assaultive and homicidal behavior. In addition, she recommended that Rick's visits with the children be suspended until both evaluations were complete.

On October 20, 2022, Adam contacted the police department to report what Noah told Mann the prior day. Although Adam was scheduled to give a statement to police the next day, he did not do so.

On October 21, 2022, DCPP interviewed Rick with his counsel present. He denied physically or sexually abusing the children. He also denied substance abuse and provided negative hair follicle drug test results from samples taken on March 23, 2022, April 18, 2022, and July 20, 2022. Rick consented to the children being evaluated by RDTC and stated that Mann may not be a neutral party. Rick became tearful when asked about touching Noah's buttocks and said the allegation was a "low blow" from Adam, who he said was retaliating against him for dissolving their relationship and to gain leverage in the custody dispute. Rick said he was open to a psychological assessment at RDTC.

On October 26, 2022, a court-appointed custody and parenting expert, Dr. Mathias Hagovsky, spoke with a DCPP caseworker. Hagovsky reported that he had observational interviews with Adam and Rick with both children. Hagovsky "did not see any alarm" and stated neither child disclosed abuse. Hagovsky reported both children responded well to both parents. Hagovsky noted it was

8

"of interest" that his observation of Rick with the children was on October 5, 2022, the same day Adam filed an order to show cause to suspend Rick's parenting time.

On November 9, 2022, Noah submitted to a psychosocial evaluation at RDTC by Dr. Jiwan Yoo. When presented with an anatomically correct drawing of a male, Noah identified the penis as "pee pee" and the buttocks as "butt." The child would not answer questions about the alleged sexual abuse. When asked what makes him sad, Noah stated, "when Papai . . ." then quickly stopped himself and said "nothing." Noah denied anyone told him what to say during the evaluation, but spontaneously said "[Rick] said 'shut up.'" Yoo reported that although Noah did not disclose abuse to her, the child may still have been sexually abused because it is not uncommon for young children to make a disclosure to one person.

Yoo also interviewed Adam, who reported Noah was engaging in sexualized behavior. Yoo opined that Adam had a "tendency to overreport the child's symptoms and/or symptoms not typically observed among trauma-exposed children." Yoo indicated the change in Noah's behavior at daycare "may indicate a level of distress." Yoo noted Noah made disclosures only to Adam and did not disclose abuse to the DCPP worker or Yoo.

Yoo concluded:

> This RDTC Psychosocial Evaluation is conducted to elicit as much reliable information as possible, given records made available at the time of the assessment, to help [DCPP] in their decision making process. No final determination is therefore made regarding confirmation of sexual abuse, physical abuse and/or neglect but rather, this evaluation assists the trier of fact in the determination of the court's findings.

Yoo recommended: (1) continuing therapy for Noah; (2) evaluation of Rick by a "psychologist with expertise in sexual offending behavior"; (3) if Rick's visits with the children resumed, the visits be supervised by the Division; and (4) the Division maintain ongoing involvement with the family.

Also on November 9, 2022, a Division worker conducted a home visit with Adam and the children. Adam told the worker the RDTC evaluation was "inconclusive" because the evaluator did "not spend enough time with the child." He inquired about having Justin evaluated for sexual abuse, noting he recalled the child having had a rash on his buttocks. When asked by the worker if he reported the rash to Justin's pediatrician, Adam said that he did not and that he wanted to change Justin's pediatrician because, in response to allegations of sexual abuse, the pediatrician said, "[Rick] would never do something like that," which Adam considered a "red flag." Adam stated his belief the children were doing better since Rick's parenting time was suspended.

10

On November 28, 2022, DCPP received a report from Noah's daycare provider stating that Noah "would always stare off but recently started putting two fingers in his mouth, which started shortly after [Adam] warned us of the signs." After Noah was seen grabbing and shaking another child at daycare, a teacher asked Noah "who does that to you?" He replied, "grandma."[6] The report also noted that on another occasion Noah was observed licking his sleeve. When told not to lick his clothes, Noah responded that "my dad (Adam) told me to do this." After Noah was asked if he was sure Adam told him to lick his clothes, he said "yes, my dad (Adam) said so."[7] The DCPP worker noted concern Adam was coaching the child.

On December 5, 2022, Mann issued a report diagnosing Noah with post-traumatic stress disorder (PTSD). In support of the diagnosis, Mann cited Rick's alleged threat to shoot Mann, and Noah's sleep disturbances, "dissociative symptoms" at home and school, and tantrums at home and school. In addition, Mann cited Noah's avoidance of discussing the alleged abuse, diminished interest in daycare, irritable behavior, aggression, and recent attempt to choke a fellow student.

---

[6] Noah clarified he referred to Rick's mother as "grandma."

[7] The record establishes the children referred to Adam as "dad."

On December 23, 2022, a Division investigator requested a case consultation from the Division's Administrative Hearings Unit (AHU), "as a result of struggling to conclude findings" in this matter. The investigator emailed the evidence adduced in the investigation to the AHU. The AHU later advised that an "unfounded" finding would be appropriate, given the record contained only secondhand disclosures from Adam, and that a "not established" finding would require a disclosure by the child to a non-parent third party.[8]

On December 27, 2022, the Division issued its finding that the allegations of Rick's sexual abuse of Noah and Justin were "unfounded." Rick was notified the investigation was closed and there was no need for further services to the family, but the case would remain open for DCPP to provide unspecified supervision. Although the December 27, 2022 letter does not explain the basis on which the Division reached its decision, DCPP records indicate that "it was determined that the findings would remain unfound[ed] due to no evidence of disclosure. As per AHU consult, a disclosure needs to be made for the findings to be [n]ot [e]stablished."

---

[8] It appears the AHU considered Mann and the children's nanny to be closely associated with Adam and that the disclosures to them did not qualify as non-parent, third-party disclosures.

Shortly thereafter, the Division, on its own initiative, reconsidered its findings. On January 6, 2023, Ann Gunning, a Division employee, sent an email to Luis Antilus, another Division employee, stating:

> If the child indicated to the therapist or to anyone else that "pee-pee" is the child's word for penis, then yes I would say that is a "not established" finding.
>
> This could be during any of the interviews (RDTC, case worker etc.) but it would have to be from the child, not the father.
>
> If we have the child's description of what "butt" is, that would be good, but I don't think we need that clarity since it is a shortening of the full word buttocks. The word "pee-pee" can have several meanings.

Later that day, Antilus emailed Bonita Christmas, another DCPP employee, stating:

> I forgot to include this attachment to the initial AHU consult request. This morning, I emailed it to Ann for review and to ask if the unfounded finding need[s] to be modified. After reviewing the report, she advised below . . .
>
> I have since reviewed the RDTC final report (page 7, 2sd (sic) paragraph), it stated that "[Noah] labeled the male genitalia as 'pee pee' and the buttocks as 'butt['']." Based on Ann['s] response, we might need to upgrade the findings to [n]ot [e]stablished.

Five days later, on January 11, 2023, Mann emailed a Division worker, stating the following:

13

> I am the treating therapist for the children . . . . I am writing to express concern for the children in this matter. Based on the letter the family received, I understand the [D]ivision reached the decision of "[u]nfounded." As one of [the] trainers of the Case Practice Model and "4 Tier System" and countless other training as part [of] our statewide reform, I can only conclude there must have been a mistake made to reach the finding of "[u]nfounded."
>
> I respectfully request you review the two reports I have written so far in this case and your agency's records to determine if you agree with the finding or if there was perhaps an error made along the way.

Mann did not copy Rick or Rick's attorney on her email to the Division.

On January 18, 2023, a Division worker visited Adam's home. Adam reported the children were not doing well and Justin was having episodes of disassociation during bath time. Adam also reported that Noah had been "very sexualized" recently and had put his finger in the dog's butt.

Adam stated he was upset and confused as to how the Division concluded the allegations were unfounded when Mann was reporting that the children were exhibiting symptoms of PTSD. According to the worker's report, Adam stated he "wants his children to be ok which is why he pays $1,000 a week in play therapy" to Mann. The worker attempted to speak to the children, but they appeared nervous and afraid. Noah ran away and Justin did not speak to the worker, who otherwise observed the children to be happy and playful.

14

On January 31, 2023, a Division employee entered an override of the December 27, 2022 decision in the agency's records. The entry stated: "Upon review of the investigation by the LOM,[9] it was determined that the Findings will be changed from [u]nfounded to [n]ot [e]stablished."

On February 1, 2023, the Division sent Rick a letter advising him that DCPP had changed its decision from "unfounded" to "not established." The letter stated that Adam was the source of the referral to DCPP and noted that Adam and Rick were "going through a challenging divorce." The agency explained the basis of its decision:

> Based on the information gathered by the Division, there is not a preponderance of the evidence that the child is an abused or neglected child by definition, however, the evidence indicates that a child was harmed or placed at risk of harm. [Noah] did not disclose any sexual abuse to the [D]CP&P investigator or the RDTC evaluator. According to [Noah's] therapist Debbie Mann, [Noah] disclosed during a play therapy session. When the therapist attempted to speak to him further regarding his statements, the therapist noted that [Noah] "became visibly distressed and appeared to dissociate."[10]

---

[9] Rick's brief identifies LOM as an acronym for local office manager.

[10] Although the February 1, 2023 decision concerns an allegation that Rick abused both Noah and Justin, the narrative explaining the basis for the agency's decision mentions only Noah.

The Division's February 1, 2023 letter stated that "[y]ou may choose to provide additional information for consideration . . . within [twenty] days of the receipt of this letter. All information received will be considered and added to the case record. The Division will promptly notify you of the outcome of that review."

On February 6, 2023, Mann wrote directly to the Family Part judge. She stated that she had communicated with both DCPP and the Advocacy Office of the Department of Children and Families and that "both agree that the investigation of child abuse for this family did not follow their policies and procedures." Mann continued:

> The initial finding for this family was "[u]nfounded" and later changed to "[n]ot [e]stablished". It is unclear why DCPP arrived at either decision and how or why the decision was changed. By definition, the "[n]ot [e]stablished" finding affirms a child was harmed or placed at risk of harm. What harm or risk of harm lead to the finding of "[n]ot [e]stablished" remains unclear. All of the information and allegations refer to the caregiver [Rick]. The decisions were made without speaking to the children about their experiences; and appears in disregard of [Adam's] numerous videos of the children disclosing various acts of physical and sexual abuse by [Rick], the school's concerns and [Noah's] statement to this writer[,] "Papai puts his peepee in my butt" . . . . Furthermore, the DCPP case remains "[o]pen for supervision". The need for supervision remains undefined.

16

Mann concluded by opining that "it would present significant risk to their safety and emotional well-being for either child to have contact with [Rick] at this time. Furthermore, it is imperative [Rick] engage in a psychosexual evaluation to determine the level of risk to the children, prior to consideration of contact with the children."

On February 14, 2023, the Family Part judge issued an order permitting Rick supervised parenting time with the children through a professionally supervised program. The court ordered a neutral therapist be appointed:

> [Rick's] cross[-]motion to restrain Dr. Mann from providing the children with therapy is hereby DENIED. While [Adam] can utilize the services of [Dr.] Mann, the parties are hereby ordered and directed to find a neutral therapist for the children. If the parties cannot do so within two (2) weeks, counsel is to advise the [c]ourt and the [c]ourt will then appoint a new therapist.

The Family Part judge relied on the Division's "not established" finding to place limitations on Rick's parenting time. As the court explained:

> Due to the DCPP investigation, for the next period of time [Rick's] parenting time shall be supervised through the . . . County Supervised Visitation Program pendente lite. The [c]ourt believes this will provide adequate safeguards for the time being. The [c]ourt also notes it is not the [c]ourt's place to question or re-evaluate the findings or investigation of DCPP. See R. 2:2-3. Therefore, since DCPP's findings were not established, [Rick] shall have supervised parenting time with the parties' children.

A-2697-22

On February 17, 2023, Rick submitted a written request the Division reinstate its finding of "unfounded," along with documents and a video recording supporting his request. Rick argued Adam was using DCPP's finding of "not established" strategically in the divorce proceedings to deprive him of custody and parenting time. Rick noted that DCPP findings, which are based on an investigation, and not an adjudication, generally remain confidential, but Adam had disclosed the Division's finding to Mann and the Family Part judge in the divorce proceeding. In addition, he argued that a "not established" finding is not appropriate for allegations of sexual abuse, as such a finding "is analogous to concluding that a child is almost sexually abused." He continued, "[i]f DCPP reached the investigatory conclusion that the children were not sexually abused, how then could there be risk of sexual abuse when sexual abuse did not occur? This is the catch 22 which invokes significant due process concerns . . . ."

In addition, Rick asserted the information on which the finding is based is unreliable. He argued: (1) the RDTC report is inadmissible hearsay; (2) Mann is biased in favor of Adam, particularly in light of her financial interest in the children continuing therapy with her; (3) Mann inappropriately held herself out as an expert in the Division's system for investigative findings before the Family Part judge; (4) the Division did not make credibility determinations with respect

to Mann or the doctor who completed the RDTC report; (5) Mann's report does not comport with DCPP guidelines because it was not given within a reasonable degree of clinical certainty; (6) Mann inappropriately expressed opinions about Rick, who she never met or evaluated, and about whom she made police reports based on a statement of a four-year-old with a history of fabricating stories; and (7) Noah's statements appeared contrived and coached by Adam and Mann.

The Division did not meet with Rick, hold a hearing, or adjudicate the allegations.  Instead, on April 18, 2023, DCPP sent Rick a letter, the entire substantive provisions of which were:

> [DCPP] received the additional information you submitted, which has been added to the case record and considered in reaching the following decision.  [DCPP] will not be changing the [n]ot [e]stablished finding as the information submitted did not alter [DCPP's] investigatory conclusion.

This appeal followed.  Rick argues:  (1) the category of "not established" authorized in N.J.A.C. 3A:10-7.3(c)(3) is arbitrary and capricious, both in the manner in which the finding is determined and, as demonstrated here, in the subsequent use of the finding in the custody dispute, and should be invalidated; (2) the "not established" finding is not viable for allegations of sexual abuse, as illustrated here by the absence of proof that Rick sexually abused his children, but the issuance of a finding that he exposed them to an unidentified harm or

19

risk of harm; (3) the Division's finding of "not established" against Rick is not supported by credible evidence in the record; and (4) the Division failed to provide Rick with sufficient due process to challenge its "not established" finding.

We granted the New Jersey State Bar Association (NJSBA) leave to file an amicus curiae brief, in which it argues: (1) the "not established" category exceeds DCPP's statutory authority and contravenes N.J.S.A. 9:6-8.40a; (2) due to its inherent amorphous nature and lack of statutory support, the standard for the "not established" finding is arbitrary and capricious, warranting its immediate abolition; and (3) if not invalidated, the "not established" finding requires an impartial adjudication with full procedural due process safeguards.

## II.

The Division has the responsibility to investigate allegations of child abuse and neglect and to take immediate action as "necessary to insure the safety of the child . . . ." N.J.S.A. 9:6-8.11. For each allegation, N.J.A.C. 3A:10-7.3(c) requires the Division to make one of four possible findings at the end of an investigation: "substantiated," "established," "not established," or "unfounded":

> 1. An allegation shall be "substantiated" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined in N.J.S.A. 9:6-8.21 and either the investigation indicates the

existence of any of the circumstances in N.J.A.C. 3A:10-7.4 or substantiation is warranted based on consideration of the aggravating and mitigating factors listed in N.J.A.C. 3A:10-7.5.[11]

2.  An allegation shall be "established" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined in N.J.S.A. 9:6-8.21, but the act or acts committed or omitted do not warrant a finding of "substantiated" as defined in (c)1 above.

3.  An allegation shall be "not established" if there is not a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, but evidence indicates that the child was harmed or was placed at risk of harm.

4.  An allegation shall be "unfounded" if there is not a preponderance of the evidence indicating that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, and the evidence indicates that a child was not harmed or placed at risk of harm.

[N.J.A.C. 3A:10-7.3(c).]

---

[11]  N.J.A.C. 3A:10-7.4(a) provides that a finding of substantiated is required where the investigation indicates:  (1) the death or near death of a child as a result of abuse or neglect; (2) a child has been subjected to sexual activity or exposed to inappropriate sexual activity or materials; (3) the infliction of injury or creation of a condition requiring a child to be hospitalized or to receive significant medical attention; (4) repeated instances of physical abuse against a child; (5) failure to take reasonable action to protect a child from sexual abuse or repeated instances of physical abuse where a parent or guardian knew or should have known that such abuse was occurring; or (6) depriving a child of necessary care, which either caused serious harm or created a substantial risk of serious harm.

A-2697-22

As we have explained,

> a "not established" finding may differ from an "established" or "substantiated" finding of abuse or neglect two ways: first, relating to the quantum of evidence, and second, the nature of the finding. To defeat a preponderance-of-the-evidence finding, the evidence that a child was <u>not</u> abused or neglected must be at least equal to or greater than the evidence the child was abused or neglected. As the [Division] explained in adopting the regulation, "not established findings are based on some evidence, though not necessarily a preponderance of evidence, that a child was harmed or placed at risk of harm."
>
> Second, in a "not established" finding, that lesser quantum of evidence "indicates" only a child "was harmed or was placed at risk of harm," and does not establish the child was an "abused or neglected child" under N.J.S.A. 9:6-8.21(c). In particular, placing a child "at risk of harm" may involve a lesser risk than the "substantial risk of harm" or "imminent danger" required to establish abuse or neglect under the statute. As the [Division] explained, "Where utilized, 'evidence indicates' refers to a child having been harmed or placed at risk of harm. This is a lesser standard than satisfaction of the statutory requirement in N.J.S.A. 9:6-8.21." A "not established" finding means "a preponderance of the evidence indicates that the statutory standard has not been met . . . ."
>
> Notably, although the regulation utilizes a passive construction – "was harmed or was placed at risk of harm" – the apparent intent is to attribute the harm or the placement at risk of harm to a particular perpetrator. Similarly, an 'unfounded' finding means the evidence indicates the alleged perpetrator did not harm the child or place the child at risk of harm.

22

[N.J. Dep't of Child. & Fams. v. R.R., 454 N.J. Super. 37, 41-43 (App. Div. 2018) (citations and footnote omitted).]

Our Supreme Court has held that DCPP's standard for making a finding of "not established" is "vague, amorphous, and incapable of any objective calibration." S.C. v. N.J. Dep't of Child. and Fams., 242 N.J. 201, 239 (2020). "All we know is that it requires less than a preponderance of the evidence and involves 'some' evidence. At the very least, the 'some evidence' description advanced by [DCPP] must be understood to be 'credible evidence.'" Ibid.

"A parent is completely cleared of wrongdoing only if the allegation is 'unfounded' . . . ." R.R., 454 N.J. Super. at 40. "The Division must indefinitely retain on file the record of 'not established' findings. N.J.A.C. 3A:10-8.1(b). But, records related to 'unfounded' findings are generally expunged. See N.J.A.C. 3A:10-8.1(a) -8.3." Id. at 40-41. Although the record of a "not established" finding is statutorily confidential, the information can be made available under circumstances identified in N.J.S.A. 9:6-8.10a. S.C., 242 N.J. at 228-30. As demonstrated here, the Division's "not established" finding with respect to Rick was disclosed to the Family Part judge, who relied on the finding to limit Rick's parenting time with the children. In addition, the finding was disclosed to Mann, who took it upon herself to submit a letter to the Family Part

23

judge challenging the Division's finding and seeking restrictions on Rick's parenting with the children.

Our review of an administrative agency's final decision is limited. Kadonsky v. Lee, 452 N.J. Super. 198, 201-02 (App. Div. 2017) (citing In re Stallworth, 208 N.J. 182, 194 (2011)). "We will not reverse an agency's judgment unless we find the decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Id. at 202 (quoting Stallworth, 208 N.J. at 194). DCPP's finding must have "fair support in the record." Dep't of Child. and Fams. v. T.B., 207 N.J. 294, 301 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)).

We "defer to the specialized or technical expertise of the agency charged with administration of a regulatory system." K.K. v. Div. of Med. Assistance & Health Servs., 453 N.J. Super. 157, 160 (App. Div. 2018) (quoting In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008)). However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Mayflower Sec. Co., Inc. v. Bureau of Sec., 64 N.J. 85, 93 (1973).

With this standard of review in mind, we turn to the Division's investigation and findings. The allegations against Rick derived from Adam,

who reported that Noah, and later Justin, disclosed that Rick had sexually abused them through acts of digital penetration. An abused or neglected child includes "a child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child." N.J.S.A. 9:6-8.21(c), (c)(3). Sexual abuse includes "contacts or actions between a child and a parent . . . for the purpose of sexual stimulation of either that person or another person[,]" including "molestation . . . other forms of sexual exploitation of children, or incest; or . . . sexual penetration and sexual contact as defined in [N.J.S.A.] 2C:14-1 and a prohibited sexual act as defined in [N.J.S.A.] 2C:24-4." N.J.S.A. 9:6-8.84. The acts alleged against Rick, if true, fall within the statutory definition of sexual abuse.

We have reviewed the record and are constrained to reverse the Division's finding that the allegations that Rick sexually abused Noah and Justin were "not established." DCPP concedes its investigation did not uncover a preponderance of the evidence that Rick sexually abused Noah or Justin. There is, therefore, insufficient proof to find that Rick digitally penetrated the children or sexually abused them in any other way.

In support of its "not established" finding, the Division argues that its investigation identified some credible evidence Noah was harmed or placed at

risk of harm by Rick.  In addition, the Division argues that because Rick exercised unsupervised overnight visitation with both children, Justin was also placed at risk of harm.  The Division's finding, however, does not identify the harm Noah suffered or was at risk of suffering as a result of Rick's actions.  The allegations against Rick were of specific sexual acts, which the Division concedes were not proven.  DCPP identifies no other conduct by Rick – sexual or not sexual – that harmed Noah or placed him at risk of harm.

Thus, the record is unlike that before the Court in S.C.  There, a parent was alleged to have engaged in excessive corporal punishment of her son.  242 N.J. at 213.  The Division found the allegation to be "not established" because there was insufficient evidence of excessive corporal punishment, but the investigation revealed that the parent had struck the child with an open hand and slammed a spatula on the counter when angry.  Id. at 218-19.  These findings, the Division found, constituted some evidence the parent engaged in behavior "leading to the possibility that she could misgauge how much force she was using and put [the child] at risk of harm."  Id. at 219 (quotations omitted).  Conversely, there is no evidence that Rick, although he did not sexually abuse the children, engaged in some other conduct that harmed them or put them at risk of harm.

The Division's sua sponte decision to reopen the investigation and to change its finding appears to have been based on Noah having identified the penis as a "pee pee" to someone other than Adam. Nothing in the record suggests there was any doubt Noah was referring to a penis when he asked Adam if he was aware that one could "stick your pee pee in a butt?" Even if one were to assume there was ambiguity in Noah's statement to Adam when it was first made, Noah's subsequent identification of the penis as a "pee pee" did not enhance the strength of the evidence that Rick harmed Noah or exposed him to a risk of harm.

After Noah's identification of the penis as a "pee pee," the Division did not change its conclusion that the investigation did not uncover a preponderance of evidence that Rick sexually abused Noah. Instead, the Division determined that Rick had harmed Noah or exposed him to harm, but did not identify the harm or explain how the child's identification of "pee pee" as a penis established he was harmed or put at risk of harm by Rick. A four-year-old boy's identification of a penis as a "pee pee" does not, on its face, suggest the child was sexually abused. The term is a relatively common one children to use to describe a penis.

We also note that in its analysis DCPP does not appear to have given any weight to Adam's admitted motivation to terminate joint custody of the children and prevent Rick from having visitation. The record casts doubt on Adam's credibility as it related to Rick and the children. Adam alleged Rick was doing drugs in front of the children. Yet, Rick countered those allegations with a series of negative drug test results over a period of several months, suggesting Adam's allegations were false. In addition, daycare workers reported Noah stating Adam told him to lick his clothing, suggesting the child had been instructed to engage in behavior indicative of a troubled child. Yoo opined that Adam had a "tendency to overreport the child's symptoms and/or symptoms not typically observed among trauma-exposed children." A Division worker expressed concern Adam was coaching Noah.

Nor did the Division consider Mann's financial interest in having the children continue therapy with her, which may have been the motivation for her unusual communications with the Division and the Family Part judge challenging DCPP's findings. See R.R., 454 N.J. Super. at 47 (noting the Division's failure to consider the motive of a parent who reported abuse to remove the alleged perpetrator from the home). "[W]e cannot have confidence in an investigation . . . nor are we obliged to defer to the resulting finding" when

"the Division overlooked . . . relevant information . . . ."  Ibid.; see also In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 386 (2013) ("[F]ailure to consider all the evidence in a record would perforce lead to arbitrary decision making."); Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001) (stating that an appellate court's deference to an agency decision "is premised on our confidence that there has been a careful consideration of the facts in issue").

In light of our conclusions, we reverse the April 18, 2023 finding of "not established" and remand for the agency to reinstate its December 27, 2022 finding of "unfounded."  Because we have reversed the April 18, 2023 finding on other grounds, we need not decide the statutory and constitutional arguments raised by Rick and the NJSBA.

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

29

A-2697-22