**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1629-23

IN THE MATTER OF
CHAD TRACY, ALBERT C.
WAGNER YOUTH
CORRECTIONAL FACILITY,
DEPARTMENT OF
CORRECTIONS.

_____

Submitted May 19, 2025 – Decided July 29, 2025

Before Judges Jacobs and Jablonski.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2019-458 and 2019-2039.

Chance & McCann, LLC, attorneys for appellant Chad Tracy (Kevin P. McCann, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Department of Corrections (Sookie Bae-Park, Assistant Attorney General, of counsel; Elizabeth A. Davies, Deputy Attorney General, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Chad Tracy, a former senior corrections officer for the New Jersey Department of Corrections ("DOC") at the Albert C. Wagner Youth Correctional Facility, appeals from the Civil Service Commission's final administrative action upholding the disciplinary penalty of removal. We affirm substantially for the reasons set forth in the Commission's decision.

I.

The underlying disciplinary measure stemmed from a December 29, 2017 incident. On that day, Officer John Strittmatter, a senior corrections officer, arrived at the cell unit desk to relieve another officer from duty as part of his assignment. Appellant, who was also present on that unit, approached the desk and said "Let me turn my back so you p*ssy and f*gs can talk behind my back." Appellant began arguing with Officer Damon Bleeker, who was also present on the unit. Bleeker repeatedly said "That's enough, Tracy. That's enough." Appellant then turned his attention to Strittmatter, calling him a "p*ssy" and a "f*g." When Strittmatter and asked appellant to "[s]top being a bully and just get out," appellant told him, "Your kids are going to grow up to be p*ssies just like you" and called his wife "a fat pig." Appellant also ridiculed Strittmatter for living in a "basement" and threatened to "knock [his] fake teeth." As

Strittmatter walked out of the cell unit to write up appellant, appellant exclaimed "And by the way, stop sucking [the administrator's] d*ck." The incident was witnessed by Officers Bleeker, Matthew Smith, and Michael Nakonechny. Strittmatter and Bleeker reported appellant over his protestations. Shortly thereafter, appellant suffered a heart attack and was transferred to the hospital for treatment. There was no video footage of the incident.

Disciplinary Actions

In their respective reports, Strittmatter and Bleeker stated that appellant called Strittmatter a "f*ggot" and a "p*ssy", threatened to knock out his "fake" teeth, called his wife "fat and ugly," mocked him for living in a "basement," and told him to "stop sucking" the administrator's "d*ck." Smith reported that he "overheard . . . [appellant] call . . . Strittmatter numerous names as well as his family [and] threatened to knock . . . Strittmatter's false teeth out of his mouth." Appellant provided a statement wherein he maintained Strittmatter and Bleeker threatened his wife during the verbal altercation. On February 6, 2018, the Special Investigations Division ("SID") investigated the matter and prepared a report.

Based on the SID report, the DOC administration served appellant with a preliminary notice of disciplinary action ("PNDA") on September 4, 2018.

A-1629-23

charging him with violations of (1) N.J.A.C. 4A:2-2.3(a)(6), conduct unbecoming a public employee; (2) N.J.A.C. 4A:2-2.3(a)(12), other sufficient cause; and (3) other departmental policy violations.[1] Following departmental hearings, the DOC issued a final notice of disciplinary action ("FNDA") upholding sustaining the charges and imposing removal.

The Equal Employment Division ("EED") conducted a separate investigation and interviewed the officers. The EED issued a PNDA on February 9, 2018, charging appellant with (1) N.J.A.C. 4A:2- 2.3(a)(6), conduct unbecoming a public employee; (2) N.J.A.C. 4A:2-2.3(a)(12), other sufficient cause; and (3) other departmental policy violations.[2] Following a departmental hearing spanning several days, the DOC issued a FNDA upholding the charges and penalty of suspension for seventy-five days.

---

[1] The PNDA included the following DOC specific disciplinary offenses proscribed in Human Resources Bulletin ("HRB") 84-17: C-11, Conduct unbecoming an employee; and C-31, Violation of DOC policy prohibiting discrimination, harassment and hostile environments in the workplace.

[2] The PNDA included the following DOC specific disciplinary offenses proscribed in Human Resources Bulletin ("HRB") 84-17: C-4, Verbal abuse of inmate patient, client, resident or employee; C-11, Conduct unbecoming an employee; E-1, Violation of a rule regulation, policy procedure, order or administrative decision; and D-7, Violation of administrative procedures and/or regulations involving safety and security.

A-1629-23

Appellant appealed to the Civil Service Commission, requesting administrative hearings on both FNDAs. The appeals were consolidated before the Office of Administrative Law.

Administrative Proceeding

Administrative hearings were held on April 18, 2023, and July 5, 2023 before Administrative Law Judge (ALJ) Dean Buono. Strittmatter testified that appellant called him a "f*g" and a "p*ssy", called his wife a "fat pig," bullied him for living in a "basement," threatened to "knock [his] fake teeth down [his] throat," and told him to "stop sucking [the administrator's] d*ck." Strittmatter clarified that he had to get his teeth replaced after his father "punched [him] in the face . . . when [he] was 14," a fact of which appellant was aware. Strittmatter also testified that appellant had directed sex-related slurs at him almost "on a daily basis" and "would always tell [him] 'Your kids are going to grow up p*ssies just like you.'" On one occasion prior to the subject incident, Strittmatter reported appellant's verbal assaults and physical threats to a Sergeant, who then advised Strittmatter to "stay away from appellant [and] just ignore him." According to Strittmatter, the name-calling was offensive to his "manhood" because it was "coming from another officer." Strittmatter denied the allegations that he threatened to expose appellant's personal affairs or that he

made racially-charged comments about appellant's wife and girlfriend.

Bleeker testified that appellant called Strittmatter a "p*ssy" and a "f*ggot", threatened to knock Strittmatter's "teeth down his throat," told Strittmatter to "stop sucking [the administrator's] d*ck," called Strittmatter's wife "a fat ugly pig," and mocked Strittmatter for living in a "basement." All these statements were made in the presence of inmates. Bleeker also testified that officers are expected to refrain from "talk[ing] about [an officer's] living situation in front of inmates" to protect the safety of the officer and to maintain a professional working environment.

Glendaliz Vega, a corrections officer at the Correctional facility and appellant's girlfriend at the time of the incident, testified that appellant told her he had "a confrontation" with Strittmatter. Vega maintained that the terms "p*ssy" and "f*ggot" are "used very often in a jail" by the officers, including Strittmatter and Bleeker, but are not used a derogatory manner. Rather, they mean that someone is "a punk" or "a wuss." According to Vega, appellant had previously told her that Strittmatter's dad "knocked his teeth out" when he was younger, calling him "a f*ggot" and "a p*ssy."

Appellant testified that the inmates and officers regularly used offensive language in jail. While appellant acknowledged calling Strittmatter a "f*ggot"

A-1629-23

and a "p*ssy" in the past, he denied using such language during the subject encounter. Rather, appellant claimed to have used these terms to express that Strittmatter was "weak [and not] a leader," just like "a girl," because Strittmatter had directed racist slurs towards inmates and mistreated them based on their skin color. Appellant conceded that he made inappropriate comments about Strittmatter's wife but allegedly only after Strittmatter threatened to expose him for cheating on his wife with Vega. According to appellant, he mocked Strittmatter's teeth because Strittmatter was relentlessly attempting to provoke him. Appellant maintained he used the phrase "sucking somebody's d*ck" to suggest Strittmatter was seeking favors from the administrator. Finally, appellant conceded that he was disciplined on a prior occasion for calling another officer a "p*ssy" and a "f*ggot."

In a November 30, 2023 initial decision, ALJ Buono found the testimony of Strittmatter and Bleeker to be "clear, concise and was reinforced by the manner in which it was delivered" and therefore "credible." The ALJ found appellant's testimony was "not credible." ALJ Buono dismissed the charge of HRB84-17 as amended and D-7 (violation of administrative procedures and/or regulations involving safety and security), sustaining all remaining charges. Although recognizing the principles of progressive discipline, ALJ Buono

A-1629-23

upheld the removal penalty, finding that the severity of the offenses warranted bypassing progressive discipline.

In a December 20, 2023 final administrative action, the Commission adopted ALJ's Buono initial decision and imposed removal, reasoning that appellant's "conduct was egregious and wholly inappropriate for a law enforcement officer" and "would clearly tend to undermine the public trust."

On appeal, appellant contends "the Civil Service Commission erred by imposing an arbitrary and capricious punishment that did not use progressive discipline."

II.

"Appellate courts have 'a limited role' in the review of [Commission] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable or ... not supported by substantial credible evidence in the record as a whole.'" Ibid. (quoting Henry, 81 N.J. at 579-80). This "deferential standard applies to the review of disciplinary sanctions as well." In re Herrmann, 192 N.J. 19, 28 (2007).

In reviewing disciplinary measures, courts "should take care not to

substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision." In re Carter, 191 N.J. 474, 486 (2007). Instead, courts should determine "whether such punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness." In re Polk License Revocation, 90 N.J. 550, 578 (1982) (citation omitted) (internal quotations marks omitted).

To ensure "proportionality and uniformity in the rendering of discipline of public employees[,]" our Supreme Court adopted the principles of progressive discipline which predicate the severity of the punishment upon the seriousness of the offense committed and the employee's disciplinary record. Stallworth, 208 N.J. at 195. "The number and remoteness or timing of the offenses and their comparative seriousness, together with an analysis of the present conduct, must inform the evaluation of the appropriate penalty." Id. at 199 (emphasis added). In instances where an employee "engag[ed] in conduct that is unbecoming to the position[,]" this court upheld the employee's termination regardless of his disciplinary record. Herrmann, 192 N.J. at 34. Pertinently, dismissal of an officer with an unblemished record "for [a violation] that went to the heart of the officer's ability to be trusted to function appropriately in his position" does not contravene the principles of progressive discipline. Id. at 35 (citing Cosme

v. E. Newark Twp. Comm., 304 N.J. Super. 191, 206 (App. Div. 1997)).  That is so because "the theory of progressive discipline [is not] a fixed and immutable rule to be followed without question."  Carter, 191 N.J. at 484.

Appellant does not dispute the proven charges against him, only the penalty. Citing to In re Hendrickson, 235 N.J. 145 (2018), appellant maintains that "a less severe punishment than termination was appropriate for language that was more offensive given the context of the utterance."  As aptly noted by the Commission:

> [H]ere, the appellant's misconduct included both inappropriate and discriminatory language as well as a threat of violence directed at a co-worker, whereas Hendrickson made a single discriminatory comment about his supervisor not in her presence that was overheard by other employees. Moreover, unlike the appellant, Hendrickson was not a law enforcement officer, who is held to a higher standard.  Accordingly, the Commission agrees with the ALJ that the appellant's conduct was egregious and wholly inappropriate for a law enforcement officer and worthy of removal without regard to progressive discipline.
>
> [(citing Hendrickson, 235 N.J. at 145).]

Appellant also argues that the slurs were "not related to a protected class that Strittmatter is part of" and that "Strittmatter himself used the same language to refer to others."  These contentions lack merit.  The record shows appellant was previously subject to discipline for using the same slurs at issue here.  In

10

other words, he understood—or should have understood—that use of such offensive language would not be tolerated, regardless of context. The following colloquy between the deputy attorney general ("DAG") and appellant at the administrative hearing highlights this point:

> [DAG]: But you also stated that you regularly call people p[*]ssies and f[*]ggots, isn't that correct?
>
> [APPELLANT]: We did throughout the jail. That's correct.
>
> [DAG]: So if you just got disciplined by it, it doesn't make sense that you wouldn't -- you wouldn't -- you've been using it on a regular basis, you got disciplined for it. But now you're saying that you wouldn't do that.

As succinctly framed by ALJ Buono in his detailed twenty-page initial decision:

> It is difficult to contemplate a more basic example of conduct which could destroy public respect in the delivery of governmental services than the image of a corrections officer cursing demeaning and using homophobic slurs while on duty in the course of his governmental function. [Appellant's] actions by cursing, demeaning and using homophobic slurs toward the officers is intolerable and unacceptable.

In adopting the ALJ's findings, the Commission concluded:

> [T]he appellant's conduct was egregious and wholly inappropriate for a law enforcement officer and worthy of removal without regard to progressive discipline. The appellant's actions would clearly tend to undermine

11

the public trust and as such, the Commission finds the penalty of removal neither disproportionate to the offense nor shocking to the conscious.

Indeed, appellants' conduct was especially egregious. As a senior corrections officer with over eighteen years of experience, appellant is "a special kind of public employee . . . . He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public." Township of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965). Appellant's conduct not only undermines public trust but also weakens the safety of security of the prison and conveys to the inmates that such conduct is tolerable. Bowden v. Bayside State Prison, 268 N.J. Super. 301, 305-06 (App. Div. 1993) ("The need for proper control over the conduct of inmates in a correctional facility and the part played by proper relationships between those who are required to maintain order and enforce discipline and the inmates cannot be doubted.").

We concur with ALJ Buono and the Commission's findings and conclusions that appellant's use of foul language, sex-related slurs, and threats of physical violence toward multiple correction officers amounted to misconduct of a law enforcement officer so egregious and intolerable that removal was justified. Both ALJ Buono and the Commission accounted for the

principles of progressive discipline and properly determined that removal is appropriate given appellant's egregious conduct.  <u>See</u> <u>Herrmann</u>, 192 N.J. at 34-35.

In sum, the Commission's decision to uphold removal was not arbitrary, capricious, nor unreasonable.  <u>Stallworth</u>, 208 N.J. at 194.  Rather, it was supported by credible, reliable evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division