**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1462-24

IN THE MATTER OF
JIMMY MERCADO,
PENNSAUKEN TOWNSHIP
POLICE DEPARTMENT.

_____

Submitted January 20, 2026 – Decided February 27, 2026

Before Judges Walcott-Henderson and Bergman.

On appeal from the New Jersey Civil Service Commission, CSC Docket No. 2024-1124.

The Vigilante Law Firm, PC, attorneys for appellant Jimmy Mercado (Christopher J. Ross, on the briefs).

Brown & Connery, LLP, attorneys for respondent Pennsauken Township Police Department (Michael J. DiPiero and Arlette Leyba, on the brief).

Jennifer Davenport, Acting Attorney General, attorney for respondent The New Jersey Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Jimmy Mercado appeals from a December 18, 2024 Final Agency Decision of the Civil Service Commission (CSC) adopting the findings of fact, conclusions of law, and recommendation of the Administrative Law Judge's (ALJ) initial decision, sustaining multiple disciplinary charges against him, including incompetency, inefficiency, or failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), and violations of the Pennsauken Police Department's rules (Department). Petitioner further appeals from CSC's affirmance of his removal from the Department as a police officer. We affirm substantially for the reasons stated in the CSC's written decision.

We discern the following facts from the record. At all times relevant to this proceeding, petitioner was a police officer in Pennsauken. On April 28, 2022, while on overnight duty, petitioner and Luis Cruz, a primary officer in the Department, were dispatched to respond to two service calls: 1) a noise complaint at approximately 10:41 p.m.; and 2) a burglar alarm at a nearby storage facility. Later the same night, the constituent who had placed the initial call to police dispatch reported that no officer had responded to the scene.

A subsequent police investigation uncovered that neither petitioner nor Cruz responded to either call, and GPS records and other evidence placed them

across town at the local Fraternal Order of Police (FOP) clubhouse, reportedly watching the NFL draft with a cadre of other officers.

Lieutenant Brian May was the first to investigate the alleged failure of petitioner and Cruz to respond to the dispatch service calls. He found that no footage was recorded for either call by petitioner's or Cruz's body-worn cameras (BWC), as required by Department policy, and that GPS data for both officers' patrol vehicles showed they remained stationary from 7:39 p.m. to 1:09 a.m. on the evening in question in the vicinity of the FOP clubhouse. Additionally, neither officer broadcasted their location over the radio during either service call, in violation of Department policy.

Further investigation revealed that petitioner's and Cruz's Daily Officer Patrol Logs (patrol logs/trip sheets) pertaining to the service calls were missing, prompting Lieutenant May to refer the matter to the Department's Internal Affairs (IA) investigations unit.

The ensuing IA investigation revealed that petitioner's trip sheets differed as to his location at the time of the initial service call by indicating that he was patrolling at the opposite end of town when Department GPS records placed his vehicle at the FOP clubhouse. During his interview, petitioner explained that he was on a lunch break during the first service call. Based on perceived

3

irregularities in petitioner's account of his whereabouts around the time of the service calls, IA referred the investigation against petitioner to the Camden County Prosecutor's Office, which declined to prosecute.

The IA investigation continued with Detective Anthony Angelone who interviewed petitioner and several other officers who were present at the FOP clubhouse on the overnight shift in question. Detective Angelone authored a report that included summaries of statements from various officers, petitioner, and Cruz, and later testified before the ALJ consistent with his report.

In his interview with Detective Angelone, petitioner explained that on the evening in question, his patrol vehicle was parked at the FOP clubhouse during his overnight shift. He attributed this to the fact that he "didn't feel well and 'was in and out of the bathroom'" at the FOP clubhouse. When asked about his failure to respond to the initial noise call, petitioner stated "he did not respond to this call because he was disregarded[1] by the primary officer, [Cruz]," and although he did not remember being dispatched, "he may have 'just said he was [en] route.'"

---

[1] To "disregard" is to inform an officer they no longer required to respond to a dispatch call-out.

A-1462-24

Regarding his failure to respond to the burglary alarm call, petitioner stated that he could not remember anything about the call, including whether he was dispatched. When confronted with proof of dispatch recordings showing that he had been dispatched on the service call, petitioner stated that he had been disregarded by Cruz in person, not over the police radio, as previously stated.

Regarding the missing trip sheet, petitioner advised Detective Angelone that he was ordered to reproduce the missing information because the original was misplaced, and he recreated the trip sheet using a combination of his memory and a review of the Department records management system.[2] Petitioner's trip sheet, however, did not reflect the approximately five-hour time period spent at the FOP clubhouse during his shift. Instead, it indicated he spent twenty-five minutes for a latrine break and then returned for another thirty-minute break.

On April 18, 2023, almost one year later, during a follow-up interview, petitioner admitted to Detective Angelone that his replacement trip sheet did not document his time at the FOP clubhouse that night. He further stated that, regarding the noise call, Cruz disregarded him, although he could not recall

---

[2] According to the record, trip sheets were missing for all the officers present in the FOP clubhouse on the night in question.

A-1462-24

whether Cruz, who was with him at the FOP clubhouse, ever left to respond to the call.

On May 16, 2023, Detective Angelone issued a report, recommending various charges against petitioner for violating Department rules and regulations.

On June 13, 2023, the Department issued a Preliminary Notice of Disciplinary Action charging petitioner with various violations of Department rules and "conduct unbecoming of a public employee." The Department next conducted a hearing and issued a Final Notice of Disciplinary Action (FNDA) on October 27, 2023, sustaining charges under: incompetency, inefficiency or failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); for conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); and neglect of duty, N.J.A.C. 4A:2.3(a)(7). The FNDA also cited petitioner for violating the following Department rules and regulations:

| | |
|---|---|
| 3.2.8 | Conduct Unbecoming a Police Officer (class 1 offense) |
| 3.3.3 | Neglect of Duty (class 2 offense) |
| 3.4.6 | False Reports (class 1 offense) |
| 3.3.8 | Obedience to Laws. Regulations and Orders (2 counts) |

A-1462-24

| 3.3.6 | Performance of Duty (class 3 offense) |
|---|---|
| 3.3.1 | Responsibilities (class 3 offense) |
| 3.4.1 | Prohibited Activity on Duty-Section F "Loafing" (class 5 offense) |
| 3.8.8 | Response to Calls (class 3 offense) |
| 3.8.7 | Availability While on Duty (class 4 offense) |
| 3.2.4 | Truthfulness (class 1 offense) |

Relying on these findings, the Department terminated petitioner's employment with the Department. During the investigation, Cruz admitted that he did not respond to the initial noise call as directed by dispatch and that he did not disregard petitioner from the call as they were both present at the FOP clubhouse.

Petitioner filed a timely appeal, which was transmitted to the Office of Administrative Law (OAL) as a contested case pursuant to N.J.S.A. 52:14B-1 to -15 for a hearing which was scheduled before ALJ William T. Cooper.[3] Detective Angelone provided substantial testimony regarding the nature and outcome of his investigation. Petitioner did not testify during the hearing.

---

[3] The OAL hearing commenced on June 26, 2024 and the record closed on October 3, 2024.

Following the presentation of the evidence, the ALJ issued a well-reasoned and thorough twenty-four page initial decision sustaining all but one charge and violation of Department rules and affirmed petitioner's termination. The ALJ concluded the charge of False Report, 3.4.6, regarding the trip sheets was not sustained.

The ALJ made specific findings regarding petitioner's conduct on the night in question and applied the law pertaining to each of the charges against him and concluded in each instance that petitioner's actions or inactions met the legal standard necessary to sustain each charge and violation of Departmental rules. The ALJ specifically found Detective Angelone's testimony regarding his investigation into the charges against petitioner to be credible. On the contrary, the ALJ found petitioner's explanation as stated in Detective Angelone's report not to be credible, and determined petitioner: failed to respond to the noise and alarm call; was not disregarded as to either call; and was untruthful, as he "fabricated his patrol log for activities occurring [on that night][] in an effort to conceal that he was at the FOP [clubhouse] for approximately five hours while on duty."

With regard to the penalty, the court first set forth the applicable law, requiring consideration of the nature of the charges and petitioner's employment

record. The ALJ next addressed the law relative to progressive discipline, noting that "some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record," and concluding that "[petitioner] has brought and sustained charges of violations [of various rules and regulations] . . . [petitioner] does not have a lengthy disciplinary record, however, his failure to answer calls that he was dispatched to . . . is a serious offense, and the penalty should reflect the same." The ALJ further cited petitioner's failure to admit to his conduct—he was at the FOP hall for approximately five hours—and instead attempted to cover up the time he spent with a fabricated patrol log, as evidence of the sufficiently egregious actions, warranting termination from his position as a police officer.

ALJ Cooper concluded petitioner's actions violated: N.J.A.C.4A:2-2.3(a)(1)—for incompetency or failure to perform duties; N.J.A.C. 4A:2-2.3(a)(6)—for conduct unbecoming of a public employee; N.J.A.C. 4A:2-2.3(a)(7)—for neglect of duty; and determined that petitioner violated the following Department rules:

3.2.8 (Conduct Unbecoming a Police Officer);

3.3.3 (Neglect of Duty);

3.3.8 (Obedience to Laws, Regulations, and Orders)
(two counts);

3.3.6 (Performance of Duty);

3.3.1 (Responsibilities);

3.4.1 (Prohibited Activity on Duty - Section F "Loafing");

3.8.8 (Response to Calls);

3.8.7 (Availability While on Duty); and

3.2.4 (Truthfulness).[4]

The ALJ's initial decision affirmed the Department's determination to remove petitioner from his position as a police officer. Petitioner appealed the ALJ's initial decision to the CSC and filed exceptions, which are not contained in the record before us.

After considering the record, including the ALJ's decision, evidence and the supporting arguments, the CSC issued a Final Administrative Decision rejecting several of petitioner's arguments and explanations pertaining to why he failed to respond to dispatch calls as "not credible," and upholding his removal from the Department and dismissed his CSC appeal.

The CSC examined the testimony of each witness, noting that the statements of several officers are consistent in that each of them admitted that a

---

[4] The charge pertaining to a violation of rule 3.4.6 (False Reports) was dismissed.

A-1462-24

number of officers had been "hanging out at the FOP hall watching the NFL draft instead of attending to their duties" on the evening in question, a fact which was corroborated by their GPS records that confirmed the vehicles were stationary for long periods of time in vicinity of the FOP clubhouse.

The CSC noted that petitioner admitted that he did not answer either call and attempted to explain his actions by stating that he was

> disregarded by Officer Cruz and he was not feeling well . . . .  However, Officer Cruz admitted that he did not respond to the disturbance complaint . . . and . . . that he did not disregard the [petitioner] from this call as they were both present at the FOP hall.

The CSC further noted its agreement with the ALJ's determination, which was substantially based on the ALJ's assessment of the credibility of Detective Angelone regarding his testimony concerning the statements made by various officers during his phase of the investigation and the documentary evidence in the record.  Further commenting on the ALJ's credibility findings, the CSC explained that "no persuasive evidence in [petitioner's] exceptions or the record [were found] to demonstrate the ALJ's credibility determinations, or his findings and conclusions based on those determinations, were arbitrary, capricious or unreasonable."

A-1462-24

Lastly, the CSC disagreed with petitioner that the penalty imposed was too harsh and instead concluded that "the sustained charges are sufficiently egregious to warrant the termination of [petitioner] from his position as a police officer."

Petitioner appealed the CSC's final administrative action, arguing the following points:

> POINT I
>
> THE CSC WAS ARBITRARY AND CAPRICIOUS IN ADOPTING THE [ALJ]'S LEGAL AND FACTUAL FINDINGS AS THOSE FINDINGS ARE NOT BASED ON SUBSTANTIAL CREDIBLE EVIDENC[E].
>
> > A.   N.J.A.C.   4A:2-2.3(a)(6)   Conduct Unbecoming a Public Employee.
> >
> > B.   Pennsauken Rules and Regulations- 3.2.4 Truthfulness.
>
> POINT II
>
> THE COURT ERRED IN FINDING DETECTIVE ANGELONE AS A CREDIBLE WITNESS.
>
> POINT III
>
> THE CSC WAS ARBITRARY AND CAPRICIOUS IN ADOPTING THE COURT'S RECOMMENDED PENALTY OF REMOVAL.

A-1462-24

A. The CSC adopted the ALJ's initial decision regarding penalty which was unsupported by the record before the court.

B. The CSC adopted the ALJ's initial decision which failed to properly consider progressive discipline.

"Judicial review of agency determinations is limited." Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable or . . . not supported by substantial credible evidence in the record as a whole.'" In re Ambroise, 258 N.J. 180, 197 (2024) (quoting In re Stallworth, 208 N.J. 182, 194, (2011)) (additional citation omitted).

On review, we examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Allstars, 234 N.J. at 157 (quoting Stallworth, 208 N.J. at 194); see also Bd. of Educ. Twp. of Sparta v. M.N. ex rel. A.D., 258 N.J. 333, 342 (2024).]

"This 'deferential standard applies to the review of disciplinary sanctions as well.'" Ambroise, 258 N.J. at 198 (quoting Herrmann, 192 N.J. at 28). "We may not substitute our own judgment for that of the agency's even though we may have reached a different result." Ibid. (quoting In re Carter, 191 N.J. 474, 484 (2007)). "We must therefore 'consider whether the "punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness."'" Ibid. (quoting Stallworth, 208 N.J. at 195) (additional quotations omitted). If we "find[] that the [CSC's] decision was arbitrary, 'the court may either finally determine the matter by fixing the appropriate penalty or remand to the [CSC] for redetermination.'" Id. at 197 (quoting Stallworth, 208 N.J. at 194).

A.

Before us, petitioner argues the final agency decision was arbitrary and capricious in adopting the ALJ's legal and factual findings and that those findings are not based on credible evidence in the record. He also argues that the termination was too severe of a penalty for his infractions. Guided by well-established legal principles enunciated above and given our limited standard of

14

review, we reject petitioner's arguments and affirm substantially for the reasons stated in the CSC's well-reasoned final administration action.

The record before us makes clear that petitioner failed to respond to two service calls while on duty on the evening in question and later attempted to conceal his inactions. Petitioner's explanations are directly contradicted by the statements of fellow officers who were with him at the FOP clubhouse during his shift, including Officer Cruz. Additionally, it is apparent from the documentary evidence presented at the ALJ hearing that petitioner's patrol vehicle remained stationary in the area of the FOP clubhouse for at least five hours during his overnight shift despite initially communicating to dispatch that he was responding to the first service call. Moreover, as the CSC found, petitioner's explanations for why he failed to respond are not credible given the uncontroverted evidence against him, including his statement that he was disregarded by Officer Cruz and stayed at the FOP clubhouse because he was unwell, even though he made no report of illness to his supervisors and took no sick leave during this period. In fact, petitioner's explanations were specifically discredited by Officer Cruz who admitted that he did not respond to the first call, did not disregard petitioner from that call, and that they were both present at the FOP clubhouse during these calls.

A-1462-24

Also critical to the ALJ's decision was Detective Angelone's testimony that the civilian who initiated the first call reported that no officer reported to the scene. He also testified that the lieutenant on duty at the time was unable to locate petitioner's daily trip sheets for the shift in question. Petitioner later reconstructed his daily trip sheet following questions about his failure to report to the service calls and fabricated the contents of his trip sheets pertaining to his whereabouts. It is clear from the ALJ's decision that he found Detective Angelone's testimony credible, including his statement that officers are required to respond to service calls immediately after being dispatched, which was not done here.

In view of this entire record, we observe no basis to disturb the discretion properly exercised by the CSC as to its finding petitioner violated various regulations and Department rules when he failed to respond to the two service calls during his overnight shift. In this regard, the ALJ did not take issue with petitioner's recreated trip sheets. Rather, the ALJ found that the discrepancies between petitioner's statements and the trip sheets were sufficient to constitute conduct unbecoming of a public employee, N.J.A.C. 4A:2-2.3(a)(6). Stated differently, the ALJ found significant that petitioner intentionally excluded any

reference to the FOP clubhouse to conceal his whereabout and recreated his trip sheets to "make it seem as if he was active while on duty."

The CSC, therefore, agreed with the ALJ's finding that petitioner's conduct was unbecoming of a public employee, and further clarified, "not only did the [petitioner] ignore his duties, of significant concern is that he compounded this dereliction of duty by fabricating an excuse, in an attempt to hide such dereliction."

As the ALJ's ruling was based on substantial credible, undisputed evidence, petitioner failed to establish the decision was arbitrary, capricious, or unreasonable. Thus, there is no basis to disturb the CSC's decision to adopt the ALJ's findings and legal conclusions sustaining these charges. See Ambroise, 258 N.J. at 197 (2024); Stallworth, 208 N.J. at 194.

B.

Petitioner next asserts that the ALJ erred in sustaining the charge of violating rule 3.2.4, for truthfulness, because of the absence of "credible evidence in the record."

Department rule 3.2.4 states: "[a]ll employees are required to be truthful at all times whether testifying under oath or when not under oath and while

17

reporting, and answering questions posed by superior officers and/or internal affairs investigators."

Here, the ALJ found two separate grounds for sustaining the charge. First, petitioner was not disregarded by Officer Cruz. Second, "[petitioner] was untruthful because he fabricated his [trip sheets] . . . in an effort to conceal that he was at the FOP [clubhouse] for approximately five hours while on duty."

Because the ALJ based his findings on petitioner's fabrication of his trip sheets "in an effort to conceal that he was at the FOP [clubhouse] for approximately five hours while on duty," and not solely for "being disregarded" as petitioner now contends,[5] we are satisfied this argument is without sufficient merit to warrant discussion. See R. 2:11-3(e)(1)(E).

C.

Petitioner further contends the ALJ erred in finding Detective Angelone's testimony to be credible, arguing the "investigation and conclusions include complete misstatements and misrepresentations regarding the facts."

"As a general rule, [a] reviewing court should give 'due regard to the opportunity of the one who heard the witnesses to judge their credibility.'"

_____

[5] Both reasons petitioner argues have already been addressed under N.J.A.C. 4A:2-2.3(a)(6), for conduct unbecoming.

A-1462-24

Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)); see also N.J. Dep't of Envir. Prot. v. Huber, 213 N.J. 338, 374 (2013). Likewise, "[a] trier of fact may reject testimony because it is inherently incredible, or because it is inconsistent with other testimony or with common experience, or because it is overborne by other testimony." Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282, 287 (App. Div. 1958).

We reject petitioner's claim that any discrepancies in Detective Angelone's report, which were the subject of cross-examination by petitioner, warrants a finding that Detective Angelone was not a credible witness. On this point, we note that petitioner correctly pointed out two inaccuracies in Detective Angelone's report, which were confirmed by Detective Angelone's testimony. First, Detective Angelone conceded his report inaccurately claims petitioner stated he was disregarded over the radio, a statement petitioner never made; and second, he confirmed his report was incorrect in claiming petitioner did not perform pre-shift and post-shift BWC checks, as required by Department policy.

Nevertheless, on the critical issue of whether the Department established that petitioner violated its rules and regulations, we are satisfied the ALJ properly found Detective Angelone's testimony credible, "straightforward,

19

detailed, and generally uncontested by [petitioner]." As the ALJ further noted, neither of the minor inconsistencies was substantial enough to undermine the detective's testimony or the investigative report admitted into evidence, because the remaining findings and conclusions were supported by extrinsic evidence, including patrol logs or trip sheets, GPS records, computer-aided dispatch reports, and testimony from other officers who were present at the FOP clubhouse during petitioner's shift.

Moreover, we observe no evidence in the record to support petitioner's contention the ALJ relied on any of Detective Angelone's "misstatements" in his initial decision. Thus, we are not convinced the ALJ erred in finding Detective Angelone's testimony credible or acted arbitrarily, capriciously, or unreasonably in finding Detective Angelone credible, given the weight of the evidence in support of its findings. Accordingly, we are convinced the CSC properly deferred to the ALJ's credibility findings.

### D.

Lastly, petitioner's argument that the CSC was arbitrary and capricious in adopting the ALJ's recommended penalty of removal from his employment as a police officer is similarly without merit. Petitioner contends that the CSC's removal of petitioner was arbitrary, capricious, and unsupported by substantial

credible evidence as Detective Angelone testified that the Department's Chief is responsible for discipline and "[w]ithout the Chief's testimony as to the penalty, the ALJ could not have possibly relied on substantial evidence in the record."

Petitioner cites no law or binding legal precedent in support of this claim. We therefore conclude it is without sufficient merit to warrant further discussion under Rule 2:11-3(e)(1)(E). For the sake of completeness, however, we add the following points.

Our review of disciplinary sanctions is subject to a differential standard. Ambroise, 258 N.J. at 198 (quoting Herrmann, 192 N.J. at 28). "We may not substitute our own judgment for that of the agency's even though we may have reached a different result." Ibid. (quoting Carter, 191 N.J. at 484). "[W]hen reviewing administrative sanctions, appellate courts should consider whether the 'punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness.'" Stallworth, 208 N.J. at 195 (quoting Carter, 191 N.J. at 484; In re Polk, 90 N.J. 550, 578 (1982).

Progressive discipline is grounded in the promotion of "proportionality and uniformity in the rendering of discipline of public employees." Ibid. (citing Town of W. New York v. Bock, 38 N.J. 500 (1962)). Generally, progressive discipline has been "utilized in two ways: (1) to 'ratchet-up' or support

21

imposition of a more severe penalty for a public employee who engages in habitual misconduct; and (2) to mitigate the penalty for an employee who has a record largely unblemished by significant disciplinary infractions." Id. at 196 (quoting Herrmann, 192 at 30-33) (quotations omitted). However, "'some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record.'" Ibid. (quoting Carter, 191 N.J. at 484). "'Thus, progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property.'" Id. 196-97 (quoting Herrmann, 192 N.J. at 33).

Here, the ALJ found that although petitioner "does not have a lengthy disciplinary record . . . his failure to answer calls that he was dispatched to . . . is a serious offense," and recommended the CSC forgo progressive discipline. Progressive discipline is not "a fixed and immutable rule to be followed without question" because "some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." Stallworth, 208 N.J. at 196 (citing Carter, 191 N.J. at 484); Herrmann, 192 N.J. at 34-36. "[P]rogressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public

22

safety and the misconduct causes risk of harm to persons or property." Stallworth, 208 N.J. at 196-97 (citing Herrmann, 192 N.J. 19, 33 (2007)).

Having reviewed this record, we are satisfied that the CSC's decision is supported by sufficient credible evidence as a whole and the sanction of removal was warranted given the gravity of petitioner's conduct in ignoring a fundamental tenet of his responsibility to the public as a police officer. See Carter, 191 N.J. at 484. Police officers serve a vital role in "enforcing and upholding the law" and in "representing law and order to the citizenry." Ambroise, 258 N.J. at 201-02 (quoting Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965) (quotation reformatted). For police officers, "acts that subvert good order and discipline" can "constitute conduct so unbecoming . . . as to warrant dismissal." Id. at 202 (quoting Herrmann, 192 N.J. at 35).

Accordingly, given our limited review of final agency decisions and deferring to the expertise of the ALJ in assessing the credibility of the witness before it, we conclude the CSC's final agency decision was not arbitrary, capricious or unreasonable.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

23